WICKER, J.
[ iDefendant, Joshua Luckey, appeals his convictions and sentences for two counts of sexual battery upon a known juvenile under the age of thirteen, in violation of La. R.S. 14:43.1. The district court granted defendant’s motion for appeal, and defendant’s appeal followed. Defendant has also filed a pro se supplemental brief. For the following reasons, we affirm defendant’s convictions and his sentences. Finding two errors patent reflected in defendant’s commitment order, we remand for correction of the commitment.
STATEMENT OF THE CASE
On April 3, 2013, the State charged defendant by bill of information with the sexual battery of a known juvenile, E.D. (D.O.B. 9/22/2005), in violation of La. R.S.14:43.1 (count 1) and with the sexual battery of a known juvenile, A.B. (D.O.B. 7/18/2008), in violation of La. R.S. 14:43.1 (count 2). The bill of information alleged that defendant committed both offenses on or between November 1, 2011 and February 3, 2013, when the juveniles were, at most, seven years old and four years old, respectively. Defendant was arraigned on these charges and entered a single plea of not guilty. Following a jury trial, the jury rendered a verdict of guilty on both counts on November 14, 2014. On February 9, 2015, the district court sentenced defendant to “[twenty-five] years on each count, those sentences to run consecutive to each other.”
On March 6, 2015, defendant filed a “notice of appeal” “from the final judgment entered by this Court on February 9th, 2015 [sic],” the date of defendant’s sentencing. Defendant did not indicate that he sought to appeal his conviction, which occurred on November 14, 2014. Several months later, defendant filed a pro se writ of mandamus with this Court because the district court had not yet granted him an appeal. This Court granted defendant’s writ of mandamus and | ^instructed the district court to enter an order granting defendant an appeal. The district court’s subsequent order reflects that defendant “sought to appeal his convictions and sentences, imposed February 9, 2015.” Although defendant did not explicitly seek review of his convictions in his March 6, 2015 notice of appeal, defendant’s sole counseled assignments of error and his three pro se assignments of error pertain only to his convictions, not to his sentences. Nevertheless, the Louisiana Supreme Court has recognized that appeals are favored in the law and has disapproved of the dismissal of appeals on “hypertechnical” grounds. State v. Armant, 02-907 (La.App. 5 Cir. 1/28/03), 839 So.2d 271, 274 (citing State v. Bunnell, 508 So.2d 55 (La. 1987)). Accordingly, we will address defendant’s assignments of error concerning his conviction and will conduct a full errors patent review.
FACTS
After meeting on a dating website, the victims’ mother, B.B., and defendant became romantically involved in November 2011. According to B.B., who identified defendant in open court, the couple had plans to marry. In December 2011, defendant moved into B.B.’s aunt’s house in Marrero with B.B. and her children, L.D., E.D., A.B., and A.W. They then moved to another home in Marrero where they lived for approximately six months. Thereafter, defendant, B.B, and the children moved into a two-bedroom apartment on Barata-ría Boulevard. In this apartment, all of the children slept in one room on the opposite side of the apartment from the bedroom in which B.B. and defendant slept. The kitch *1225 en and the bathroom separated the two bedrooms.
Although B.B. acknowledged that defendant could be harsh with the children in terms of discipline, B.B. testified that the children loved him and that he would babysit them when she had something to do. She denied ever seeing | .¡defendant abuse the children, and she never observed any strange behavior that might suggest any issues with defendant and her children. B.B. testified that, in the weeks leading up to the day when the allegations came to light, she felt like defendant was hiding something from her and maybe was cheating on her.
According to B.B., on February 3, 2013, at about 7:30 a.m., she woke up, went into the kitchen of the Barataría Boulevard apartment, and saw defendant putting frozen fruit in a cup for her oldest daughter, E.D., who was seven years old at the time. When B.B. asked defendant “what was [E.D.] getting that for,” defendant responded that E.D. “had cleaned up the dog’s mess on the floor.” B.B. testified that, at the time, she thought nothing of it. Later that morning, as she cooked breakfast, her oldest son, L.D., helped her with the dishes. According to B.B., L.D. commented to her that “[E.D.] was a lucky bird because she always got all the hugs and kisses.” B.B. testified, “[T]hat set an alarm off in my head.” B.B. then approached E.D. to ask her if anything was wrong: “[S]he told me that Josh had been coming in her room at night and that she wasn’t getting any sleep and that he had been touching her. So I grabbed her by the arm, and I went into the room. And I grabbed my cell phone, and I dialed 911.”
Among the police officers who responded to B.B.’s call was Deputy Thelma Hill. Deputy Hill testified that, after speaking with B.B. who reported that E.D. told her “that Josh comes into their room at night and talks and feels on her,” she spoke with E.D., who explained to her that Josh comes in her room at night when she’s asleep and touches her on her vagina and sometimes places his finger in there.”. E.D. told Deputy Hill that the last time defendant came into her room was the previous night and that defendant agreed to give her a frozen treat if she agreed to hug him. E.D. explained to Deputy Hill that she complied but that defendant did not want to let her go when she wanted to leave. Deputy Hill testified that she also spoke with B.B.’s son, L.D., who told her that defendant comes into the children’s | .(bedroom at night “all the time” and talks “very low” to E.D. When Deputy Hill asked E.D. whether she had ever seen defendant’s private area, E.D. responded affirmatively, adding that “he shows it to her all the time.” E.D. reported to Deputy Hill that defendant has “some types of scars or designs on [his penis].” Thereafter, Deputy Hill confirmed with B.B. that defendant has “some type of implants or something on his penis.”
Detective Ronald David Ray, Jr., the lead investigator in this matter, also testified that E.D. reported to him at the scene that “Joshie had been touching her in what she termed her tu-tu.” When Detective Ray asked E.D. to explain “tu-tu,” E.D. pointed to her vaginal area. Detective Ray testified that E.D. also confirmed her statement about “the bumps” on defendant’s genitalia. Based on E.D.’s statement concerning unusual bumps or scarring on defendant’s penis, Detective Ray obtained a search warrant to take photographs of defendant’s person. Detective Ray testified that the photographs—which were admitted into evidence and published to the jury—reveal bumps on defendant’s penis in the shapes of a heart and a diamond.
At the scene, Detective Ray also interviewed E.D.’s older brother, L.D., who likewise confirmed that he would see de *1226 fendant come into the children’s room at night and give E.D. lots of hugs. At the Detective Bureau, Detective Ray also spoke with defendant who denied any inappropriate touching but “did say that there may have been some inadvertent contact during playtime.” Although defendant maintained to Detective Ray that he gave E.D. the treat “because she had cleaned up some dog feces,” defendant also made the statement that he told B.B, “[Bjelieve your daughter.” In her testimony, B,B. confirmed that defendant made this statement to her: “I don’t understand why he told me believe my daughter, but he did tell me believe my daughter.”
|fiThe day after B.B. learned of E.D.’s allegations she felt compelled to ask her younger daughter, A.B., who was four years old at the time, whether “anything bad had ever happened to her, if anybody had touched her anywhere they wasn’t [sic] supposed to.” According to B.B., A.B. “kind of like put her head down and told [B.B.] that Joshie did'—Joshua, they called him Joshie at the time—that he did when [B.B.] was in the shower.”
Approximately two weeks later, on February 18, -2013, Dr. Jamie Jackson, a pediatrician with the Audrey Hepburn Care Center at Children’s Hospital, performed a sexual assault examination of E.D., which included an incident history- During this examination, E.D. explained, “He gave me frozen fruit for it.” When asked what “it” was, E.D. responded,
Uh never mind, I forgot because when, when my brother [L.D.] he flipped me over it hurt [sic]. And it hurt my brain .... Because the reason why I can’t remember lots of things when [L.D.] flipped, flipped me over on, from the skateboard it hurt half, parts of my brain and I can’t really remember stuff. It crunched up some a [sic] my file cabinets in here.
Nevertheless, the transcript from this examination reflects E.D. then explained to Dr. Jackson that defendant comes into hers and her siblings’ bedroom while everyone is sleeping: “He touches me and then I wake up, I go, I wake up and then I fall back asleep, and stay sleeping, and [sic] never comes back in there.” After E.D. referred to the place where defendant touched as her “too too,” she explained to Dr. Jackson that “too too” refers to her vaginal area: “He kept on digging his finger and li [sic], licking his fingers and digging it in there .... He like pulls down my pants, and then he pulls down my panties and touches [with his finger].” E.D. further explained that she would later experience pain when she tried to use the bathroom: “And then I wake up to use the bathroom, it burned so bad and I had to tell my mom, cause I can’t stand it. When he does that.” E.D. told Dr. Jackson that defendant did this to her “[m]ore, more than one time.” E.D. also described to | fiDr. Jackson how, more than once, defendant tried to make her touch his “bird” with her hand: “Like every time that he ma [sic], tried to make me do it, I tried to scream out to my mom, but he kept on doing that, and I, and I couldn’t talk .... [H]e was closing up my mouth so I couldn’t scream to my mom while she was sleeping.” When Dr. Jackson asked E.D. whether there was “anything that you noticed or saw like on his bird,” E.D. replied, “Like you know how wires look? .... It looks like he has wires inside his bird skin. Like four layers of it .... Like you know how wires are so fat? That’s how fat little lines on him [sic].” E.D. reported to Dr. Jackson that defendant told' her, “[I]t’s a secret between us and you may never tell.” In accordance with the State’s motion in limine pursuant to La. C.E. Art. 412, the State presented and the district court admitted a redacted version of the transcript and of the audio of this examina *1227 tion and incident history, which removed only references to unrelated past sexual abuse allegations E.D. made against a family member in another jurisdiction.
On March 1, 2013, Dr. Jackson also performed a sexual assault examination on E.D.’s younger sister, A.B. The State introduced the transcript and audio of this examination and published it to the jury. In her incident history, A.B. told Dr. Jackson that defendant is in jail because he touched her on her “tutu” with his hand. A.B. identified her “tutu” as being between her legs. A.B. explained it hurt when defendant did this, but she did not want to elaborate any further for Dr. Jackson.
At trial, the district court accepted Dr. Jackson as an expert in the field of child abuse pediatrics and delayed disclosure. Although Dr. Jackson testified that neither E.D. nor A.B. showed any definitive physical signs of abuse, Dr. Jackson opined that both E.D. and A.B. delayed disclosure of their sexual abuse, which is common in child victims of sexual abuse, and that E.D.’s and A.B.’s interviews and incident histories were consistent with those of children who have been [7sexually abused. Dr. Jackson explained that it is not uncommon for a young female child not to show physical signs of abuse, even after they reported penile-vaginal penetration by a full-grown male. Dr. Jackson pointed to a study in which only about six percent of girls around the age of seven who reported penile-vaginal or penile-anal penetration had specific findings of penetration. In her experience examining children, Dr. Jackson estimated that ninety to ninety-five percent of the children the Audrey Hepburn Care Center sees have normal or non-specific findings when they give a history of sexual abuse or penetration.
Around the same time, in late February 2013, E.D. and A.B. received evaluations at the Jefferson Children’s Advocacy Center. The State admitted videos of both of these interviews and published them to the jury. During this interview, E.D. told the interviewer that she did not remember why she had come that day, explaining that, during an incident on a skateboard, she “damaged up her brain a lot” where the bad memories were. A.B., on the other hand, testified that defendant touched the skin on her “tutu” and stuck his finger inside of it. Gesturing toward her genitalia, A.B. explained that defendant made her “tutu” hurt.
E.D. and A.B. also testified in person at trial. According to E.D., who was nine years old at the time of trial, defendant touched her “where he was not supposed to” and “in [her] private area” about four times, in her top bunk while her brother, L.D., and two sisters, A.B. and A.W., slept in the room with her. E.D. also testified concerning the distinctive markings on defendant’s penis, describing that defendant’s “weird thing” or “private part” had “little—like circles of wire on it.” However, when asked to identify defendant in the court room, E.D. explained, “Now I don’t see him. I forgot where I saw him at .... I don’t see him.” E.D. recounted that defendant touched her on her clothes and on her “tu-tu” but, when asked, she stated she did not know if defendant stuck his finger inside of her. A.B., who was six years old at the time of trial, testified that she does not like defendant 18beeause “he did something bad to [her, E.D., and L.D.].” When asked what defendant did to them, A.B. responded that he “touched like our private parts.” Although she testified that defendant touched underneath her clothes, A.B. denied that he put something inside of her. A.B. maintained that this occurred one time when , she was four years old and that defendant touched her between her legs while she was in her mom’s and defendant’s bedroom. Like E.D., A.B. also could not identify defendant in court but testified *1228 she was four years old the last time she saw him.
After the State rested, defendant testified that he never touched E.D. and A.B. inappropriately. Although defendant admitted that he had implants inserted in his penis to “pleasure” females, he denied every exposing himself to E,D. Rather, he argued that E.D. must know about the implants from her mother, B.B., to whom he had sent naked pictures prior to moving in with her.
Defendant also recalled B.B. to the stand to question her about the extent of her contact with defendant following his arrest. Although initially B.B. denied speaking to defendant in any way—“[n]ot by phone, not by letter, no”—B.B. eventually admitted that she wrote a letter, dated August 31, 2013, to defendant that she mailed through his mother. Thereafter, B.B. vigorously asserted that this was the only letter she had ever written defendant. Defendant then introduced a second letter from January 8, 2014, in which B.B. failed to reference the sexual abuse charges and wrote, “I want our family back but you have to prove to me no other bitches! I hope you can forgive me! I never wanted none of this!” Although B.B. testified she initially did not remember writing the letter, she identified the handwriting as her own and recalled writing the letter as she read it.
On rebuttal, the State offered the testimony of Arturio Rodriguez, who testified remotely via WebEx, a program for transmitting two-way live video. Mr. Rodriguez, an inmate at David Wade Correctional Center serving a forty-year [9sentence for two counts of forcible rape and convictions for carnal knowledge of a juvenile and aggravated burglary, initially testified that he told his lawyer that defendant had fabricated the January 8, 2014 letter to make it appear like it had come from B.B. On cross-examination, however, Mr. Rodriguez admitted that he was lying when he gave this information to the district attorney because he had hoped to get a more favorable plea deal.
DISCUSSION
Assignment of Error 1 and Pro se Assignment of Error 3
In his only counseled assignment of error and in his third pro se assignment of error, defendant argues that the State violated his Sixth Amendment right to confrontation and a public trial- when, subject to cross-examination by defendant, it presented the testimony of rebuttal witness, Arturio Rodriguez, via WebEx, a video program for transmitting two-way live video. Because of this video testimony, defendant argues that he could not confront “face-to-face” the witnesses against him and that the physical absence of the witness from the courtroom denied defendant the light to a public trial.
The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to confront the witnesses against him. The Confrontation Clause of the Louisiana Constitution specifically and expressly guarantees the accused the right “to confront and cross-examine the witnesses against him.” La. Const. Art. I, § 16; State v. Robinson, 01-273 (La. 5/17/02), 817 So.2d 1131, 1135. Confrontation not only means the ability to confront the witnesses physically but also to secure for the opponent the opportunity of cross-examination, which is its main and essential purpose. Id. Cross-examination is the principal way to test the believability and truthfulness of the testimony, and it has traditionally been used to impeach or discredit the witness. Id.; State v. Williams, 1004-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, writ denied, 05-0081 (La. 4/22/05), 899 So.2d 559.
*1229 In Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666, the United States Supreme Court addressed the issue of whether the federal Confrontation Clause precluded a child witness in a child abuse case from testifying against a defendant at trial outside the defendant’s physical presence, by one-way closed circuit television. There, the defendant argued that the Sixth Amendment required “face-to-face” confrontation and that anything less failed to satisfy the constitutional guarantee. Although the Craig Court acknowledged that the Confrontation Clause guarantees defendant a “face-to-face meeting with witnesses appearing before the trier of fact,” the Court recognized that it has never held that “the Confrontation Clause guarantees criminal defendants the absolute right to a face-to-face meeting with witnesses against them at trial.” 497 U.S. at 844, 110 S.Ct. at 3163. Rather, “the Confrontation Clause reflects a preference for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case.” Id. at 849,110 S.Ct. at 3165 (internal citations omitted). That the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with. Id. at 850, 110 S.Ct. at 3166. A defendant’s right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial (1) only where denial of such confrontation is necessary to further an important public policy and (2) only where the reliability of the testimony is otherwise assured. Id. The requisite finding of necessity must be a case-specific one. Id. at 855, 110 S.Ct. at 3169. Under Craig, it is the State’s burden to make an adequate showing of necessity. Id. (“[W]e hold that, if the State makes an adequate showing of necessity, the State interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that | ^permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.”).[1]
Here, the State did not make any showing of necessity, and the record reveals no grounds upon which the district court could have reasonably reached the conclusion that denial of confrontation is necessary to further an important public policy. The State argues that the district court relaxed the confrontation requirement because the State called Mr. Rodriguez unexpectedly and the court did not wish to delay the trial for the time required to issue a writ for Mr. Rodriguez’s appearance, for prison officials to arrange sufficient security for the transport, and for officials to transport Mr. Rodriguez from the correctional facility in north Louisiana to the Twenty-Fourth Judicial District Court. Given that the United State Supreme Court determined that Maryland’s interest in protecting the well-being of child abuse victims “may be sufficiently important to outweigh, at least in some cases, a defendant’s right to face his or her accusers in court,” we decline to find *1230 that the State’s interest in a slightly swifter resolution of this case rises to the level of an important public interest that would justify the denial of confrontation. Id. at 853, 110 S.Ct. at 3167 (emphasis added). Because the procedure utilized by the district court denied defendant his right to “face-to-face” confrontation, because the State failed to advance any important state interest, and because the district court failed to make a case-specific finding of necessity as required by Craig, we find that district court’s decision to permit Mr. Rodriguez to testify via WebEx, even subject to cross-examination, violates defendant’s Sixth Amendment Confrontation Clause rights.
| ^Nevertheless, a violation of'a defendant’s right to confrontation is subject to a harmless error analysis. State v. Placide, 11-1061 (La.App. 5 Cir. 6/28/12), 109 So.3d 394, 399-400; State v. Merwin, 07-807 (La.App. 5 Cir. 4/15/08), 984 So.2d 842, 846. An error is harmless when the guilty verdict was surely unattributable to the error. Whether an error is harmless in a particular case depends upon many factors, including the following: (1) the importance of the witness’ testimony; (2) whether the testimony was cumulative in nature; (3) whether corroborating or contradictory evidence regarding the major points of the téstimony existed; (4) the extent of cross-examination permitted; and (5) the overall strength of the State’s case. Id. at 846.
Here, the State presented Mr. Rodriguez’s rebuttal testimony to discredit defendant’s theory that B.B. wrote apology letters to him for falsely accusing him while he was in jail. Given B.B.’s admission that she penned the letters at issue, Mr. Rodriguez’s testimony had very little importance, as the State’s own witness corroborated Mr. Rodriguez’s ultimate testimony that defendant did not seek to fabricate the letters. ■ Further, Mr. Rodriguez’s testimony was cumulative on the point for which the State originally offered it as- Cynthia Cimino, Mr. Rodriguez’s attorney, also testified that defendant sought to fabricate letters from ■ B.B, to claim his innocence and testified as to what the fabricated letter would contain. Thus, independent of Mr. Rodriguez’s testimony, the State presented face-to-face testimony regarding the letters despite the fact that Mr. Rodriguez recanted his testimony. Moreover, despite the face-to-face confrontation violation, defendant received the opportunity to thoroughly and effectively cross-examine Mr. Rodriguez. Finally, the State presented a very strong case, including the victims’ trial testimony, photographic evidence corroborating one of the victim’s stories, and the testimony of the State’s expert in child abuse pediatrics and delayed disclosure who testified that, in her opinion, E.D. and A.B. had been sexually |1sabused. Taken together, this evidence proves beyond a reasonable doubt that defendant was guilty of sexual battery of a known juvenile under the age of thirteen with respect to E.D. and A.B. Based on the foregoing, we find that any violation of defendant’s right to confrontation by erroneous admission of Mr. Rodriguez’s testimony via WebEx was harmless error unattributable to the guilty verdicts.
 Additionally, defendant argues that his right to a public trial was denied when Mr, Rodriguez testified via WebEx because the public could not see Mr. Rodriguez during his testimony. La. C.Cr.P. Art. 841(A) provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” La. C.Cr.P. Art. 841(A) requires a party to make known to the court “the action which he desires the court to take, or of his objections to the action of the court, and the grounds thereof.” State v. Videau, 13-520 (La.App. 5 Cir. *1231 12/27/13), 131 So.3d 1070, 1085, writ denied, 14-212 (La. 9/12/14), 160 So.3d 965.
In order to preserve the right to appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. Id.; State v. McClain, 04-98 (La.App. 5 Cir. 6/29/04), 877 So.2d 1135, 1144, writ denied, 04-1929 (La. 12/10/04), 888 So.2d 835. A new basis for an objection may not be raised for the first time on appeal. Id. (citing State v. Johnson, 03-620 (La.App. 5 Cir. 10/28/03), 860 So.2d 180, 187, writ denied, 03-3171 (La. 3/19/04), 869 So.2d 849). The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem. Id. It is also intended to prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. Id.
|uAt no time prior to, during, or subsequent to Mr. Rodriguez’s testimony did defendant lodge an objection on the basis that his right to a public trial was violated. Rather, he raises it as a new basis for the first time in this appeal. Therefore, defendant’s argument regarding his right to a public trial was not preserved for appellate review.

Pro Se Assignment of Error 1

In this pro se assignment of error, defendant argues that the trial court erred in permitting the State to present the testimony of the victims, E.D. and AB., without a competency hearing. Defendant contends that neither victim could identify him in court, and he 'asserts that they could not comprehend the difference between a lie and the truth. Therefore, he argues that he was denied his “Sixth Amendment Rights of Due Process,” which entitles him to a new trial.
Every person of proper understanding is competent to be a witness except as otherwise provided by legislation. La. C.E. Art. 601. “Understanding, not age, is the test of competency for any witness.” State v. Foy, 439 So.2d 433, 435 (La. 1983); State v. Chester, 14-540 (La. App. 5 Cir. 11/25/14), 165 So.3d 1006, 1009. A vital determination to be ascertained is whether the witness understands the difference between the truth and falsehoods. Id. The competency of a child to testify as a witness is based not only on the child’s answers to questions testing his understanding but also on the child’s overall demeanor. Id. A child’s sometimes hesitant or unresponsive answers do not necessarily indicate ihcompetency. Id.; State v. Humphrey, 412 So.2d 507, 516 (La. 1982). Those answers may be part of an overall demeanor in the unfamiliar- courtroom experience which favorably reflects testimony only as to what is clear to the child. Chester, 165 So.3d at 1009.
A trial court’s, determination on the competency of a child to testify is entitled to great weight on appeal because the trial court judge has the crucial | ^advantage of seeing and hearing the child. State v. Troulliet, 94-183 (La.App. 5 Cir. 9/14/94), 643 So.2d 1267, 1270 (citing State v. Foy, 439 So.2d 433, 435 (La. 1983)). The trial court judge is vested with wide discretion in determining the competency of the child witness and his ruling will not be disturbed on appeal, absent manifest abuse of discretion. Chester, 165 So.3d at 1009.
During trial, the State called E.D. and A.B. as witnesses. Defense counsel objected to E.D.’s competency on the basis of her age and her failure to identify defendant in court, which the trial judge noted for the record. As to A.B., defense counsel was mid-objection when he was interrupted by the trial judge, who commented, *1232 “Yeah. I’m going to give them a little bit longer to try to develop that, but I note your objection for the record.” Therefore, defendant’s objection only preserved his right for appellate review as to the competency of the witnesses. He has waived his right to review for any alleged Confrontation Clause or due process errors.
When asked to identify defendant in the courtroom, E.D. responded, “I forgot where I saw him at .... I don’t see him.” She reported that she is nine years old and that her birthday is September 22. She answered questions regarding the name of her school and her grades. When questioned by both the State and defense counsel, she testified repeatedly that she knew the truth from a lie and that she was telling the truth.
A.B. also could not identify defendant in court and testified via a hypothetical that the truth is good and lies are bad. A.B. testified that she attends school “on the west bank” and that, she is in first grade. She could also provide the name of her teacher. A.B. further testified that she is six years old and that her birthday is in a “hundred” days. A.B. also provided the names and ages of her four brothers and sisters. •
|1BIn our view, the district court did not abuse its discretion in finding that E.D. and A.B. were competent to testify as witnesses. Although E.D. and A.B, failed to readily identify defendant in court, both appeared to understand the questions asked of them. Despite their young ages, they were both coherent and responsive to the questions asked and both indicated that they knew the difference between the truth and lies. Accordingly, we find that this assignment of error is meritless.

Pro Se Assignment of Error 2

In his second pro se assignment, defendant asserts that the State admitted and published to the jury the redacted/altered tape and transcripts of E.D.’s interview at the Audrey Hepburn Care Center in violation of La. R.S. 15:440.5(A)(3). Defendant argues that the admission of this evidence also denied defendant his rights to confrontation and to present a defense. Defendant contends that these rights were violated because defense counsel could not elicit testimony on cross-examination regarding previous sexual abuse allegations made by E.D. Further, defendant asserts that the State failed to comply with the strict statutory requirements of establishing the tape as competent and admissible evidence at trial.
During pre-trial, the State filed and the trial judge granted a motion in limine in accordance with La. C.E. Art. 412 to prevent testimony as to previous accusations of abuse made by the victim against a relative in another jurisdiction. In compliance with the district court’s ruling on the motion in limine, the State edited the Audrey Hepburn Care Center audiotape and redacted the transcript to eliminate any reference to these prior accusations. At trial, defense counsel objected on the grounds that the documents and the audiotape were “manipulated/’ and “according to the statute, the use of these documents and this information is supposed to be restricted and only allows unredacted or unmanipulated documents....”
IitAs an initial matter, defense counsel did not object to the admission of this audio and transcript on the Confrontation Clause or Due Process bases he now raises for the first time on appeal. Accordingly, defendant has waived review of this alleged error on those bases. La. C.Cr.P. Art. 841.
The Louisiana Supreme Court has considered several factors, derived from United States v. Starks, 515 F.2d 112 (3d Cir. 1975), when determining whether a party has established a foundation for the admissibility of an audio recording. See State v. Hennigan, 404 So.2d 222, 236 n.7 *1233 (La. 1981). Although the Supreme Court has never held that the establishment of each of these facts is necessary for the admission of audio recordings, we consider the following factors helpful in reviewing whether the State properly laid a foundation for the admissibility of the redacted audio recording of Dr. Jackson’s interview with E.D.:
(1) That the recording device was capable of taking the conversation now offered in evidence.
(2) That the operator of the device was competent to operate the device.
(3) That the recording is authentic and correct.
(4) That changes, additions or deletions have not been made in the recording.
(5) That the recording had been preserved in a manner that is shown to the court.
(6) That the speakers are identified.
(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.
Starks, 515 F.2d at 122 n.11; see State v. Jones, 45,429 (La.App. 2 Cir. 8/11/10), 46 So.3d 756, 762. Dr. Jackson testified that the incident history she conducted with E.D. was recorded on a C.D. and that the C.D. accurately reflected the conversation she had with E.D. Dr. Jackson also testified that, during E.D.’s interview, she and E.D. were the only individuals in the room. The State demonstrated that the conversation was voluntary and in good faith when it elicited |18testimony from Dr. Jackson that she took E.D.’s incident history “for medical diagnosis and treatment so that [she knew] what things [she] need[ed] to do, what may have touched what, what type of testing, .. .what other things [E.D. and A.B.] may be at risk for.” Although defense counsel objected to the admission of a redacted version of this interview, we do not find the district court erred in permitting the State to use the redacted version of the interview against the defendant. Under La. R.S. 15:450, “Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.” After reviewing and comparing the original transcript of E.D.’s Audrey Hepburn Care Center interview and the redacted version the district court admitted into evidence at trial, we find that the district court did not abuse its discretion in finding that the State properly laid the foundation for the admission of this evidence and in denying defendant’s request to admit the entirety of E.D.’s statement. The redacted version of the interview accurately reflects E.D.’s statements to Dr. Jackson. The only portions removed from the audiotape concern past sexual behavior of a sexual assault victim excluded in accordance with La. C.E. Art. 412. Moreover, defendant had ample opportunity to question E.D. concerning the charged offenses during cross-examination. Under these circumstances, we do not find the district court abused its discretion in admitting the redacted audiotape of E.D.’s interview.[2] Accordingly, we find this assignment of error meritless.
j, «ERRORS PATENT REVIEW
The record was reviewed for errors patent, according to La. G.Cr.P. Art. 920, *1234 State v. Oliveaux, 312 So.2d 337 (La. 1975), and State v. Wetland, 556 So.2d 175 (La. App. 5 Cir. 1990). Our review reveals that there are errors patent in this case.
First, defendant was arraigned on April 5, 2013, and according to the minute entry, it appears he entered a single plea of not guilty rather than a guilty plea on each count. La. C.Cr.P. Art. 555 provides, in pertinent part: “A failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty.” State v. Lawrence, 08-1317 (La. App. 5 Cir. 2/18/09), 6 So.3d 912, 916, writ denied, 09-790 (La. 12/18/09), 23 So.3d 932. The record does not reflect that defendant objected to this error. Therefore, we find that defendant waived this error, and no corrective action is necessary.
Second, defendant was charged on counts one and two with sexual battery of a juvenile under the age of thirteen in violation of La. R.S. 14:43.1, where the offense was alleged to have been committed on or between November 1, 2011, and February 3, 2013. At the time of the offense, the punishment was, as follows: “imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years [with at] least twenty-five years of the sentence imposed ... without benefit of parole, probation, or suspension of sentence.” La. R.S. 14:43.1(0(2) (emphasis added). According to the transcript, the district court imposed defendant’s sentences on count one and count two without designating that the sentences must be served at hard labor. The commitment, however, reflects that the sentences were to be served at hard labor. Generally, when the transcript and commitment are inconsistent, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La. 1983). Nevertheless, because the underlying statute, La. R.S. 14:43.1, requires that the sentences were to be served at hard labor, allowing 120no discretion to the trial judge, the error is harmless and requires no corrective action. See State v. Tillery, 14-429 (La.App. 5 Cir. 12/16/14), 167 So.3d 15, 29, unit denied, 15-106 (La. 11/6/15), 180 So.3d 306 (finding that because the underlying statute required the sentence to be served at hard labor, the trial judge’s failure to state three life sentences were at “hard labor” was harmless error which required no corrective action).
Third, neither the commitment nor the transcript indicates that the trial judge ordered at least twenty-five years of the sentences imposed to be served without benefit of parole, probation, or suspension of sentence in compliance with La. R.S. 14:43.1(0(2). La. R.S. 15:301.1(A) provides that in instances where the statutory restrictions are not recited at sentencing, they are included in the sentence given, regardless of whether or not they are imposed by the sentencing court. Given the self-activating nature of the benefits provision, we find no need to take corrective action concerning the trial court’s failure to specify that defendant’s consecutive sentences of twenty-five years on two counts of sexual battery were to be served without benefit of parole, probation, or suspension of sentence. See State v. Williams, 00-1725 (La. 11/28/01), 800 So.2d 790, 798-800; State v. Rainey, 14-664 (La. App. 5 Cir. 12/16/14), 167 So.3d 94, 96 (given the self-activating nature of the benefits provision, this Court found no reasons to correct the trial court’s omission to specify the defendant’s sentences were to be served without benefit of parole, probation, or suspension of sentence).
Finally, review of the record reveals that the trial court failed to inform defendant of the prescriptive period for seeking post-conviction relief. This Court has corrected this error patent by way of its opinion. See *1235 State v. Do, 13-290 (La.App. 5 Cir. 11/19/13), 130 So.3d 377, 394, writ denied, 13-2907 (La. 6/20/14), 141 So.3d 285; State v. Ramsey, 10-333 (La.App. 5 Cir. 1/25/11), 60 So.3d 36, 42; State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ 21denied, 09-158 (La. 10/16/09), 19 So.3d 473. Accordingly, we advise defendant by way of this opinion, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. Arts. 914 or 922.
DECREE
For the foregoing reasons, we affirm defendant’s two convictions for sexual battery of a known juvenile and his two consecutive sentences of twenty-five years imprisonment at hard labor in the Department of Corrections. We remand this matter for correction of the commitment order to reflect that defendant’s consecutive sentences are to be served at hard labor without benefit of parole, probation, or suspension of sentence.
AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT.

. In Louisiana, the Legislature has enacted a procedure by which a Louisiana court can order that the testimony of a "protected person” be taken without “face-to-face” confrontation when the court has made a specific finding of necessity. See La. R.S. 15:283; La. R.S. 15:440.1-15:440.6. Under La. R.S. 15:440.2 a "protected person” is "any person who is a victim of a crime or a witness in a criminal proceeding and who is either...(1) [u]nder the age of seventeen years [or] (2) [h]as a developmental disability as defined in R.S. 28:451.2(12).” See also La. R.S. 15:283 (E). Mr. Rodriguez is not a “protected person” as defined by La. R.S. 15:440,2 or La. R.S, 15:283(E). Accordingly, the procedures enumerated in R.S. 15:283 and R.S. 15:440.1, et seq., do not apply in this case.

. Defendant argues that the district court should have excluded this audiotape pursuant to La. R.S. 15:440.5. La. R.S. 15:440.5 provides constitutional safeguards for a defendant’s right to confrontation with respect to the admission of videotaped statements. We find that the requirements of La. R.S. 15:440.5 are inapplicable to this case because the redacted "tape” to which defendant refers was an audiotape of E.D.’s Audrey Hepburn Care Center interview. The State did not seek to enter a videotape of this interview.