PENZATO, J.
The defendant, Vernell Day, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty and, following a jury trial, was found guilty as charged. He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant now appeals, designating three counseled assignments of error and one pro se assignment of error. We affirm the conviction and sentence.
FACTS
In August of 2014, the defendant was living at North 28th Street in Baton Rouge with his eight-year-old daughter, D.B., and his five-year-old son, J.B. As the children's biological father, the defendant was given custody of D.B. by the Department of Children & Family Services (DCFS) when she was about five years old. A few months *176 prior to August of 2014, DCFS placed J.B. in the care and custody of the defendant.
On the evening of August 18, 2014, the defendant and his children were at home. According to D.B., who testified at trial, she and the defendant were in the defendant's bedroom watching television. J.B. was in the adjacent bedroom on his knees, having been punished by the defendant. At some point, the defendant brought J.B. into his bedroom and placed him on his knees in there. According to D.B., while the defendant was standing directly in front of J.B., J.B. "looked funny at him or something or in a rude way." Angered at J.B. apparently having shown some sign of disrespect toward him, the defendant grabbed J.B. by the ankle and, without letting go, swung J.B. around the bedroom. J.B.'s head struck the wall and the door several times. According to D.B., J.B.'s head also struck the floor about two times.
J.B. became unresponsive from the injuries he sustained. The defendant carried J.B. to the couch and tried to resuscitate him. With J.B. showing no signs of consciousness, the defendant called 911. The defendant told D.B. to tell anyone who asked that J.B. had been jumping on the bed in the defendant's bedroom and had fallen off and hit his head. J.B. was taken by ambulance to Our Lady of the Lake Regional Medical Center (OLOL). After a preliminary examination in the emergency room, J.B. was moved to the pediatric intensive care unit (PICU).
Corporal Andrew DeSalvo, with the Baton Rouge Police Department, went to the hospital and took pictures of J.B. The photographs revealed that J.B. was malnourished and had bruises and marks on much of his body, including on his head, legs, back, buttock, and ear.
Dr. Jeffrey Gruner, a trauma surgeon at OLOL, testified at trial that J.B. was the "sickest of the sick." Dr. Gruner noted that J.B. was very thin and very small for a five-year-old. Dr. Gruner documented the various injuries to J.B., including bruises on the right buttock, left ear, left hip, left forehead, and a pronounced hematoma on the right side of the forehead. Dr. Gruner thought J.B.'s injuries were from nonaccidental trauma. Dr. Gruner testified that the pattern of bruising to J.B.'s head suggested multiple blows to his head. Dr. Gruner consulted with a neurosurgeon about a possible surgery. However, they decided against surgery because J.B.'s Glasgow Coma Scale score was so poor and because with the extent of the diffuse injury within the brain, there would have been no benefit from surgery.
Dr. Brian Binck, a pediatric intensivist, was the attending physician who cared for J.B. in the PICU. In his death summary report, Dr. Binck noted that J.B. had been intubated when he was first brought in because he had made no effort to breathe on his own. During a neurological exam, Dr. Binck discovered that J.B.'s pupils did not constrict to light, which according to Dr. Binck, was extraordinarily abnormal. There was no evidence of brainstem activity. Dr. Binck noted that J.B. was very emaciated and had multiple fresh bruises on various parts of his body, including his chest, forehead, thighs, and sacral area. A CT scan of J.B.'s head revealed subdural bleeding. The radiologist was highly suspicious that the injuries were caused by nonaccidental trauma, and Dr. Binck concurred. Dr. Binck testified that, with falls, you do not see severe head trauma and multiple bruises all over the body.
After twenty-four hours of nonresponsiveness by J.B., including no attempt to breathe on his own, J.B. was eligible for a brain-death examination, which was performed by Dr. Binck's partner. Dr. Binck repeated the exam twelve hours later.
*177 Having determined that J.B. was brain dead, Dr. Binck declared J.B. deceased.
Dr. Yen Van Vo, a forensic pathologist, performed the autopsy on J.B. Dr. Vo noted several injuries on J.B.'s body, including a hematoma within a contusion on the right side of the head; various bruising and abrasions on the chest; bruising on the left side of the neck; bruising on the left shoulder and left arm; and bruises on the knees, left thigh, right foot, and on the left and right side of the back and buttocks. Dr. Vo was very suspicious that J.B. was malnourished. Dr. Vo determined that J.B.'s cause of death was multiple blunt force injuries. Dr. Vo testified that J.B. had bruises over much of his body.
Dr. Vo found two separate discrete areas of hemorrhage and hematoma near the frontal bone of J.B.'s head and subgaleal hemorrhage all over his skull. Near the occipital bone (back of the head), Dr. Vo found three discrete areas of bleeding, which according to the doctor, meant these injuries were caused by three different events. Dr. Vo also found acute (recent) subdural hemorrhage in J.B.'s brain. Dr. Vo testified that there had been injury to every portion of J.B.'s brain.
The defendant testified at trial. The defendant indicated J.B. had not been injured from falling off his bed. The defendant explained he had told D.B. to tell people that J.B. had been jumping on his bed because the defendant was afraid, and he did not want to lose his children to DCFS. According to the defendant, J.B.'s injuries were accidental. At the time of the incident, J.B. was in the defendant's bedroom, but he was not punished or on his knees, as D.B. had testified. J.B., rather, was sitting in a small chair. The defendant, in a playful manner, picked up the chair, with J.B. still in it, and swung the chair around. J.B., according to the defendant, slipped off the chair and hit the bed and then the floor. Unhurt and happy, J.B. got up and ran toward the defendant. The defendant then grabbed J.B. by his arms, picked him up, and began swinging J.B. around. J.B. slipped from the defendant's grip. J.B. hit the wall and the door and fell to the floor.
COUNSELED ASSIGNMENT OF ERROR NO. 1
In his first counseled assignment of error, the defendant argues that the trial court erred in denying his request to have his own expert evaluate D.B. The defendant further argues that the trial court erred in allowing a social worker to be present with D.B. during her testimony, which violated his right to confrontation.
Prior to trial, the State filed a motion for protected person's testimony to be taken outside the courtroom. The State contended in the motion that D.B. qualified as a "protected person" under the provisions of La. R.S. 15:283 because she was a witness to a crime who was under the age of seventeen years; that she would likely suffer serious emotional distress if forced to give testimony in open court; and without simultaneous televised testimony, could not reasonably communicate her testimony to the jury.
Louisiana Revised Statutes 15:283 provides as follows:
A. On its own motion or on the motion of the attorney for any party, a court may order that the testimony of a protected person who may have been a witness to or victim of a crime be taken in a room other than the courtroom and be simultaneously televised by closed circuit television to the court and jury, when the court makes a specific finding of necessity based upon both of the following:
*178 (1) Expert testimony that the protected person would be likely to suffer serious emotional distress if forced to give testimony in open court.
(2) Expert testimony that, without such simultaneous televised testimony, the protected person cannot reasonably communicate his testimony to the court or jury.
B. The court shall ensure that the protected person cannot see or hear the accused unless such viewing or hearing is requested for purposes of identification. However, the court shall ensure that the accused is afforded the ability to consult with his attorney during the testimony of the protected person.
C. The only persons who may be present in the room with the protected person are the person or persons operating the audio-video equipment, the presiding judge, the attorneys for the state, the attorneys for the defendant, and any person, other than a relative of the protected person, whose presence is determined by the court to be necessary to the welfare and well-being of the protected person during his testimony. The persons operating the equipment shall be confined to an adjacent room or behind a screen or mirror that permits them to see and hear the protected person during his testimony but does not permit the protected person to see or hear them.
D. Only the attorneys, or the presiding judge as authorized by law, may question the protected person.
E. For the purposes of this Section, "protected person" means a person who is the victim of a crime or a witness in a criminal prosecution who is either of the following:
(1) Under the age of seventeen years.
(2) Has a developmental disability as defined in R.S. 28:451.2(12).
The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. This right provides two types of protections for a criminal defendant: the right to physically face those who testify against him and the right to conduct cross-examination. Coy v. Iowa, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988). However, public policy considerations and necessities may take precedence over "face-to-face" confrontation. Maryland v. Craig, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990).
In Maryland v. Craig, the Supreme Court addressed the issue of whether the Confrontation Clause of the Sixth Amendment categorically prohibits a child witness in a child abuse case from testifying against a defendant at trial, outside of the defendant's physical presence, by one-way closed circuit television. The State sought to invoke a Maryland statutory procedure, similar to La. R.S. 15:283, permitting a judge to receive, by one-way closed circuit television, the testimony of a child who is alleged to be a victim of child abuse. To invoke the procedure, the trial judge must first "determin[e] that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." Md. Cts. & Jud. Proc. Code Ann. § 9-102(a)(1)(ii) (1989). Craig , 497 U.S. at 840-41, 110 S.Ct. at 3160-61.
The Craig Court, 497 U.S. at 855, 110 S.Ct. at 3169, held:
[I]f the State makes an adequate showing of necessity, the [S]tate interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a *179 child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.
The requisite finding of necessity must be a case-specific one. Craig , 497 U.S. at 855, 110 S.Ct. at 3169. Under Craig, the trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the testifying child witness; the trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. Craig, 497 U.S. at 855-56, 110 S.Ct. at 3169. Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than "mere nervousness or excitement or some reluctance to testify." Craig, 497 U.S. at 856, 110 S.Ct. at 3169. See State v. Stogner, 2009-0172 (La. App. 1st Cir. 6/19/09), 2009 WL 1717173 (unpublished), cert. denied, 562 U.S. 854, 131 S.Ct. 117, 178 L.Ed.2d 72 (2010) ; State v. Hicks, 2008-0511 (La. App. 1st Cir. 9/19/08), 2008 WL 4287559 (unpublished), writ denied, 2008-1986 (La. 5/15/09), 8 So.3d 578. See also State v. Carper , 45,178 (La. App. 2nd Cir. 6/9/10), 41 So.3d 605, 608-10, writ denied, 2010-1507 (La. 9/3/10), 44 So.3d 708.
At a pretrial hearing on the State's motion on June 15, 2016, the State called Noel Andrus, a licensed clinical social worker, and Toni Bankston, a licensed clinical social worker and the executive director of the Baton Rouge Children's Advocacy Center (CAC). Ms. Andrus testified she had a master's degree in social work, and she was employed with the Baton Rouge CAC. Ms. Andrus indicated she specialized in treating trauma in children. She was accepted by the trial court as an expert in clinical social work with a specialty of treatment of child trauma. According to Ms. Andrus, she began working with D.B. on October 29, 2014. D.B. was initially seen by Ms. Bankston, but was then transferred to Ms. Andrus for treatment because she (D.B.) had witnessed her father, the defendant, kill her younger brother. D.B. had fifty-three individual therapy sessions with Ms. Andrus and eight sessions of group therapy. At the time of the hearing, D.B. was seeing Ms. Andrus once a month, and the last time Ms. Andrus saw her was on May 31, 2016.
According to Ms. Andrus, when D.B, first began therapy, she was "very guarded, extremely avoidant," and "very angry." D.B. would not talk about her brother and would only briefly mention her father. D.B.'s feelings toward the defendant were that he was bad and scary, and she did not like him. When the topic of her brother or father was raised in therapy, she would become anxious and fearful, and she would refuse to talk. About one year into treatment, D.B. began to talk about the incident she had witnessed. When describing what she had witnessed, she would become angry and agitated.
When asked about testifying at trial, D.B. indicated she was willing to testify, but not in front of the defendant. Ms. Andrus indicated that, if made to testify in front of the defendant, D.B. would not speak; she would shut down. According to Ms. Andrus, D.B.'s feelings of fear and anxiety would prevent her from testifying in front of the defendant. Ms. Andrus indicated that D.B.'s level of anxiety was "maybe greater than what you see in most children." Ms. Andrus added that if D.B. had to testify in front of the defendant, it would be "a ginormous trigger for her and it would set her back." By "trigger," Ms. Andrus meant that it would trigger "the emotional responses caused by the trauma that she witnessed." Ms. Andrus further *180 indicated D.B. has also had very strong physiological reactions at the mention of her brother or the defendant, such as developing hives, stomach pains, and headaches. Shortly thereafter, the following exchange between the trial court and Ms. Andrus took place:
The Court: In your opinion, would this child be traumatized by being forced or attempt to force the child to testify in a courtroom in the presence of this defendant?
A. Absolutely. I feel she would be retraumatized.
The Court: In what way?
A. By coming in, resurfacing all those emotional responses that she's had in the past. The progress this child has made is just amazing and where she's at now compared to where she was a little over a year and a half ago.
The Court: Is it your opinion that it would cause serious or severe emotional distress to this child by doing that?
A. Absolutely.
The Court: In what way, again?
A. In to regressing back to anger, the physiological responses, acting out in school, behavioral outbursts in school and at home.
The Court: Would this trauma be because simply because she's in a courtroom or because she's in the presence of the defendant, her father?
A. I believe that she's in a courtroom with her father, correct.
The Court: With her father?
A. Correct, providing testimony. I think the act in itself of providing the testimony would not, but in front of her father, yes.
The Court: So the presence of the defendant would, is what you feel, would be the factor that would cause severe emotional distress to this child?
A. That is correct.
Ms. Bankston, qualified by the trial court as an expert in clinical social work and child trauma, provided similar testimony. According to Ms. Bankston, if made to testify in front of the defendant, the probability would be very high that D.B. would not only suffer great emotional distress, but she would be "retraumatized" by it. Ms. Bankston further indicated that she did not believe it would be in D.B.'s best interest to testify in front of the defendant; Ms. Bankston added that she thought making D.B. testify in front of the defendant would risk "medically a regression in her behavior." Ms. Bankston agreed with Ms. Andrus that forcing D.B. to testify in the presence of her father would cause serious emotional distress.
Prior to ruling on the State's motion to allow D.B. to testify outside of the presence of the defendant, the trial court took up the defendant's motion to have an independent examination of D.B. by an expert of either the trial court's or the defendant's choosing. No witnesses were called; the defendant's motion consisted of argument only. The trial court denied the defendant's motion. Following argument on the State's motion, the trial court found that based on the experts' testimony, it was strongly likely that D.B. would "shut down and not testify because of the fear and/or fear of emotional distress that would be caused by forcing the child to testify in the presence of the defendant." Accordingly, the trial court granted the State's motion to allow D.B. to testify outside of the presence of the defendant.
The defendant in brief argues the trial court erred in denying the defendant's motion to appoint another expert to evaluate D.B. The defendant notes the trial court did not speak to or observe D.B. The trial court's ruling, according to the *181 defendant, prevented him from being able to adequately rebut the State's claims that it would cause emotional distress for D.B. to testify in his presence. The only testimony, the defendant suggests, "was presented on behalf of the State by CAC workers, who admittedly collaborate with law enforcement in criminal prosecutions."
After a careful review of the record, we see no reason to disturb the trial court's denial of the defendant's motion to appoint his own expert. We note initially that the emotional distress that forced testimony in the defendant's presence would cause D.B., was not a claim made by the State, as suggested in the defendant's brief. These were claims made by the experts who treated D.B. and worked with her in therapy. While the trial court did not personally question D.B., it is clear that there is nothing the trial court could have learned from speaking with D.B. for a few minutes that Ms. Andrus and Ms. Bankston had not already laid out in detail, based on information acquired over a year, including fifty-three individual therapy sessions and eight sessions of group therapy.
At the pretrial hearing, the trial court specifically addressed the need vel non of another expert witness, as well as the impartiality of the experts who testified. Following is the relevant exchange between Ms. Andrus and the trial court regarding these issues:
The Court: Do you consider yourself in any way an arm or agent of the prosecution or the law enforcement?
A. No. We're a neutral agency at the CAC. We're in the best interest of the children is what the CAC serves.
The Court: Would your treatment and/or therapy, as you call it in this case, be the same as if you had been hired by the defense to treat this child?
A. Absolutely.
The Court: Exactly the same?
A. We would work with the child in regards to the trauma in which she experienced just like we are now. And no way to obtain answers or responses or, when children come into therapy we let them know you're in charge, it's your case.
The Court: If I ordered [D.B.] ... to be examined by a social worker or a psychologist or psychiatrist or mental health worker picked by me or chosen by the defense for one or two sessions, what affect [sic] and what level of cooperation would you expect from [D.B.] and/or any affect [sic] on her?
A. I would guess initially it would be just like she was with me or anyone else with her school-based social worker or myself being guarded, being resistant, not wanting to go through yet another assessment in which she's been through so many times.
Later at the hearing, the following relevant exchange took place among the trial court, a prosecutor, and Bankston:
Ms. Jarreau [prosecutor]: Knowing [D.B.'s] history and how she's progressed, if she were to be evaluated or ordered to be evaluated by a different clinical psychologist or social worker, how do you think she would respond to that?
A. I think it would be very distressful and, by the way, one of the foundations of the child advocacy movement in this country has been to limit the amount of times a child is interviewed about a crime. So it goes against what we know is helpful and can be harmful for children to push for multiple interviews. That's the whole reason we exist is to have one interview and not multiple interviews and to continue to assess a child about a crime.
* * * * *
*182 The Court: What would you expect her level of cooperation to be if this Court ordered one or two assessments by an independent, another independent person?
A. My assessment is that it would be limited. I think her cooperation is limited, but I think it would be better than it would have been two years ago.
The Court: Would it be beneficial or ... non-beneficial to the child?
A. To have another evaluation? I think it's-speaking very candidly-I think it's unnecessary.
The Court: That's not my question whether it's necessary.
A. I really don't see a benefit. I really-I do not see a benefit of having her evaluated. I think there's enough information in her clinical history and with the experts who have worked with her so far that you can feel solid about the assessment that those experts are making.
* * * * *
The Court: The only-use the expression-dog in this fight that you have is the interest of this child?
A. Absolutely.
The Court: Not loyalty to the district attorney or to the defendant?
A. Absolutely not.
The foregoing testimony supports the trial court's decision to allow D.B. to testify outside of the presence of the defendant (by closed circuit television) without another examination by an expert submitted by the defendant (or the trial court). Both Ms. Andrus and Ms. Bankston indicated that their evaluation and treatment of D.B. was for the benefit of D.B., and that their findings and/or testimony would not have changed, regardless of who hired them to provide testimony. The law overwhelmingly supports allowing child victims to avoid the imposition of unnecessary independent examinations and the extra trauma associated with testifying in the presence of their alleged abusers. See State v. Day, 2014-708 (La. App. 3rd Cir. 12/23/14), 158 So.3d 120, 131-34.
Further, the defendant has not demonstrated any prejudice to his defense in the trial court's denial of his motion to order an independent examination of D.B. All of the elements of confrontation were preserved during D.B.'s testimony, except the ability of D.B. to see the defendant while she testified. As such, there can be no prejudice in the procedure employed, regardless of whether the defendant was denied his request for an independent examination of D.B. See Day, 158 So.3d at 134 ; State v. Collins, 2010-0757 (La. App. 4th Cir. 5/11/11), 65 So.3d 271, 279-82, writs denied, 2011-1185 (La. 11/23/11), 76 So.3d 1153, 2011-1719 (La. 1/20/12), 78 So.3d 140 ; State v. Daniels, 484 So.2d 941, 943-45 (La. App. 1st Cir. 1986). Cf. State v. Welch, 99-1283 (La. 4/11/00), 760 So.2d 317, 321 (reversing a conviction for molestation of a juvenile following a bench trial where defendant sat behind a screen so alleged nine-year-old victim could testify without having to see him, the Louisiana Supreme Court found that neither the State nor the trial court attempted to comply with La. R.S. 15:283(A), wherein the trial court, with no expert testimony taken, ordered the "screening" of the defendant "merely on a generalized statement of possible trauma for child witnesses."); cf. Hicks , 2008 WL 4287559 (finding no case-specific evidence to prove the necessity of protecting child witness from the trauma of testifying in the presence of defendant, where given that social worker's testimony only addressed the prospect of child testifying in any courtroom setting, and CAC interviewer met with child only once, neither expert could provide direct testimony *183 regarding any trauma they felt child would experience by testifying in the presence of defendant).
The defendant also asserts in this assignment of error that the trial court erred in allowing Ms. Andrus to be present with D.B. while D.B. testified from another courtroom, via closed circuit television. According to the defendant, he was prejudiced because the trial court based its ruling (to allow Ms. Andrus to be with D.B. during her testimony) "solely on the testimony of the CAC worker."
Louisiana Revised Statutes 15:283(C) specifically provides that persons who may be present in the room with the protected person (during her testimony) include "any person, other than a relative of the protected person, whose presence is determined by the court to be necessary to the welfare and well-being of the protected person during his testimony." At trial, prior to D.B. testifying, and outside of the presence of the jury, the trial court took up the State's motion in limine to have a person whose presence is necessary to the welfare of D.B. present during her testimony.
When asked how D.B. might respond if she were forced to testify without a "familiar face" or "support person" in the courtroom with her, Ms. Andrus testified the possibilities were endless, some of which included D.B. shutting down, being very anxious, or having physiological reactions from her anxiety. There could even be "possible regression (of her progress in treatment)," Ms. Andrus continued, from D.B. "not having that emotional support." The prosecutor then asked Ms. Andrus if she believed that a support person's presence was necessary to protect D.B.'s well-being. Ms. Andrus replied, "Absolutely." Ms. Andrus reiterated the necessity of a support person (herself) being present with D.B., particularly in light of the fact that D.B. was already anxious about testifying and was told just that morning that she would have to testify alone.
The following relevant exchange then took place between the trial court and Ms. Andrus:
Q. And is it necessary for the child's well-being and welfare?
A. Yes.
Q. If you weren't there and she did shut down, do your fear that there would be a regression in her treatment?
A. Possibly.
* * * * *
Q. So do you think it's necessary and important for her welfare that someone, like you that she's comfortable with, be in that courtroom while she testifies?
A. Absolutely.
In granting the State's motion in limine, the trial court stated in pertinent part:
The Court, based on the testimony of the child's clinical social worker, who has a specialty in the treatment of child trauma, M[s]. Andrus, the Court, based on her testimony here today, which is the only testimony provided to the Court here today, is that it is necessary for the welfare and well-being of the child for her to be allowed to be in the room while the child is testifying, and the Court will so allow.
Based on the testimony of Ms. Andrus, the trial court, in accordance with La. R.S. 15:283(C), determined that the presence of someone with whom D.B. was comfortable while she testified was necessary for D.B.'s welfare and well-being. We find no abuse of discretion in the trial court's ruling. There was no indication that Ms. Andrus's presence prejudiced the defendant. Further, nothing in the record suggests that Ms. Andrus interacted with or communicated in any way with D.B. during her *184 testimony. See Daniels, 484 So.2d at 944-45.
For the foregoing reasons, we find the trial court did not err in denying the defendant's motion to compel an independent examination of D.B.; and the trial court did not err in granting the State's motion in limine to allow Ms. Andrus to be present with D.B. while she testified at trial. See Day, 158 So.3d at 131-134.
Accordingly, this counseled assignment of error is without merit.
COUNSELED ASSIGNMENT OF ERROR NO. 2
In his second counseled assignment of error, the defendant argues the trial court erred in not questioning a juror as to his relationship with the prosecutor's case agent.
The defendant's argument is baseless. Following selection of the jury and just prior to opening statements, one of the prosecutors informed the trial court at a sidebar conference that Detective Bryan Ballard, the State's case agent, had informed him (the prosecutor) that he "vaguely" knew one of the members of the jury, Jeremy Naquin. Detective Ballard said that his wife and Mr. Naquin's wife knew each other or used to work together. Detective Ballard and Mr. Naquin were not friends, but they had seen each other before. The trial court informed the parties that they would proceed to opening statements and, that following this, if anyone had a request regarding this issue, it would address it then.
Following opening statements, outside of the presence of the jury, the issue was again taken up. The trial court informed defense counsel that if the defense requested it, it would question the juror about how or if he knew Detective Ballard. Defense counsel, Dele A. Adebamiji, informed the trial court he had spoken to his client (the defendant), and he did not want the juror to be questioned by the trial court. The trial court again told Mr. Adebamiji, "But if you request me at any time, I will call that juror in alone and ask him about it, okay?" Finally, the trial court asked, "So right now you do not want me to ask-bring the juror in alone and question the juror about that?" Mr. Adebamiji replied, "That's correct, Judge."
Any relationship or familiarity between Detective Ballard and Mr. Naquin appeared tenuous, at best. More importantly, however, there was no objection made, regarding this issue. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. Code Crim. P. art. 841(A). The purpose of the contemporaneous objection rule is to allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. The rule also prevents a defendant from "sitting on" an error and gambling unsuccessfully on the verdict, then later resorting to an appeal on an error that might have been corrected at trial. State v. Smith, 2006-0820 (La. App. 1st Cir. 12/28/06), 952 So.2d 1, 17, writ denied, 2007-0211 (La. 9/28/07), 964 So.2d 352.
Herein, the defendant not only did not object, he specifically informed the trial court not to question Mr. Naquin. The defendant failed to lodge a contemporaneous objection and, as such, he is precluded from raising this issue for the first time on appeal.
This counseled assignment of error is without merit.
COUNSELED ASSIGNMENT OF ERROR NO. 3; PRO SE ASSIGNMENT OF ERROR
In his third counseled assignment of error, the defendant argues he was denied *185 effective assistance of counsel because defense counsel failed to request that the trial court poll the jury on its guilty verdict. According to the defendant, when the time comes that non-unanimous jury verdicts in felony prosecutions are found to be unconstitutional, he may be precluded from arguing his conviction should be vacated because his guilty verdict may have been non-unanimous.
In his sole pro se assignment of error, the defendant argues that the third counseled assignment of error (failure by defense counsel to request polling) has no merit. The defendant asserts that "one day" Louisiana's non-unanimous jury verdict system will be reversed and that, as such, defense counsel's failure to request polling would prevent the defendant from arguing on post-conviction relief that his conviction should be vacated because it was unclear whether "the guilty verdict rendered in this case was unconstitutional." See La. Code Crim. P. art. 930.4. Accordingly, the defendant asks that the third counseled assignment of error be withdrawn from this appeal.
A claim of ineffective assistance of counsel is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. State v. Miller , 99-0192 (La. 9/6/00), 776 So.2d 396, 411, cert. denied, 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001).
We find that there is no ripe issue here to consider. The issue raised by the defendant herein would become justiciable or actionable only if the legislature changed the law to require unanimous verdicts and made the new law retroactive.
This counseled assignment of error, and the pro se assignment of error, are without merit or otherwise not subject to appellate review.
CONVICTION AND SENTENCE AFFIRMED.