STATE OF LOUISIANA

VERSUS

WILLIE H. BATTLE

NO. 23-KA-272

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 17-8002, DIVISION "E"
HONORABLE FRANK A. BRINDISI, JUDGE PRESIDING

June 17, 2024

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Marc E. Johnson, and Scott U. Schlegel

<u>**AFFIRMED**</u>
    **FHW**
    **MEJ**

<u>**CONCURS WITH REASONS**</u>
    **SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Darren A. Allemand
    Shannon K. Swaim
    Kristen Landrieu
    Taylor Somerville

COUNSEL FOR DEFENDANT/APPELLANT,
WILLIE BATTLE
    Jane C. Hogan

**WICKER, J.**

Defendant, Willie Battle, appeals his conviction for the second degree murder of Everett Burns, in violation of La. R.S. 14:30.1. Upon review of the record on appeal, we find the evidence produced at trial is sufficient to support defendant's conviction, the trial court did not err in admitting evidence of an unrelated shooting in which defendant was a victim which occurred nine days before the murder of Everett Burns, or in declining to issue a written order or reasons when ruling upon defendant's motion in limine on the record, or in permitting Amanda Williams (formerly Harris) to identify the two perpetrators seen in a surveillance video as defendant and his co-defendant. However, we find the trial court committed error in permitting a State's witness to testify via Zoom while deployed on active duty overseas. That evidence, however is harmless in light of the abundant evidence of defendant's guilt admitted in the trial of this case. For the reasons fully discussed below, we affirm defendant's conviction.

**PROCEDURAL HISTORY**

On April 5, 2018, a Jefferson Parish Grand Jury returned an indictment, charging defendant, Willie H. Battle, with second degree murder of Everette Burns, in violation of La. R.S. 14:30.1, on November 22, 2017. The same indictment also charged co-defendant, Eddie Salvant, IV, with one count of second degree murder in violation of La. R.S. 14:30.1 and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1. Defendant was arraigned on April 6, 2018, and pled not guilty.

On June 29, 2020, the State filed a "Motion in Limine to Determine Admissibility of Evidence of Prior Shooting." A hearing on the State's motion was held on October 15, 2020, and granted on October 16, 2020.

Defendant and Salvant proceeded to trial on January 23, 2023. A twelve-person jury unanimously found defendant and Salvant guilty as charged. On

February 1, 2023, the trial court sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant appeals his second degree murder conviction.[1]

## FACTS

On November 22, 2017, the day before Thanksgiving, at approximately 4:40 p.m., the victim, Everette Burns, was shot in the stomach. A Good Samaritan drove Mr. Burns to the closest emergency room; however, he later succumbed to the injuries he sustained from the gunshot wound.

During the January 2023 trial, Husan Jaber, a longtime employee of Nathan's Discount, a gas station located in the strip mall at 401 Lapalco Boulevard in Gretna, described the strip mall and the events he observed there on November 22, 2017. Within the strip mall, he identified a snowball stand, which was next to Nathan's Discount, Boss Cuts, a barbershop which was next to the snowball stand, and a laundromat on the end of the strip mall. On that day in 2017, Mr. Jaber's uncle entered the store and told him there were two men outside with hoods on and that one had a gun. Mr. Jabar called the police, and upon exiting Nathan's Discount, he saw two men in hoods hit a man in a yellow shirt in front of the snowball stand. Mr. Jabar then heard a gunshot, and he saw the man in the yellow shirt put his hand on his stomach and run to his car. The man in the yellow shirt was later identified as the victim, Mr. Burns.

When the police arrived, Mr. Jaber gave them the store's surveillance videos for the period from 4:00 p.m. through 5:00 p.m., which provided several different angles of the crime scene. While the surveillance video was played for the jury, Mr. Jaber identified himself as the man standing by the doorway of Nathan's Discount. The video depicted two suspects with the hoods of their black

---

[1] This appeal relates to defendant, Battle, only.

sweatshirts pulled tightly around their faces. The shorter individual was wearing black pants and the taller individual was wearing gray pants. Mr. Jaber indicated on the video the point at which the shorter man walked in front of him while holding a gun in his hand. He did not see anything in the second man's hand.

Later, Mr. Jabar met with the police who showed him two photographic line-ups. In the first line-up, he identified co-defendant, Salvant, as the shorter man he saw after the shooting. He added that Salvant was a customer he had seen before. In the second line-up, Mr. Jabar was unable to make an identification.

At the time the shooting occurred, Ali Charlemagne testified he was at Boss Cuts barbershop with his sons waiting for them to get haircuts. Mr. Charlemagne was on his cellphone outside the front of the barbershop when he saw two black men in hoodies and one had a pistol under his arm. He then went back into the barbershop to retrieve his two sons and told others in the barbershop, "[T]here's two guys out there with a pistol." He, his sons, and others moved to the back area of the barbershop, and then heard a gunshot.

Roosevelt Malone, III testified he was working at Boss Cuts on November 22, 2017, when the victim came in to get a "shape up." After Mr. Malone finished his haircut, the victim left to get money from the ATM at Nathan's Discount. Mr. Malone then heard a gunshot and saw the victim get in his car, put it in reverse, and pass out. Mr. Malone and his cousin-in-law, Lyndon Miller, ran to the car to stop it from going into traffic on Lapalco Boulevard. Mr. Malone leaned over the victim to put the car in park and noticed the victim had been shot, was bleeding, and in and out of consciousness. Mr. Malone and Mr. Miller called the police and removed the victim out of his car to try to stop the bleeding. When the police took too long, Mr. Miler decided that they could not wait any longer for assistance, so they put the victim in the back seat of the victim's car, and Mr. Miller drove the victim to Ochsner Westbank. Mr. Malone remained at the scene until the police

arrived and gave them the victim's cell phone. Mr. Malone testified that he did not see any guns on the victim or inside his car.

Lyndon Miller testified that on November 22, 2017, he was at Boss Cuts with his nine-year-old son. His son was in one of the chairs getting his haircut when he heard a guy say, "No, not here, not here." He realized something was going on, so he grabbed his son, and ran into the bathroom. When he heard a gunshot, he covered his son, and more people came into the bathroom. He left the bathroom, and headed towards the front door when he heard Mr. Malone saying, "No, no, no, no." At that point, he went to the victim's car, and saw the victim was slumped over in the front seat with a gunshot wound to his stomach. The victim was not conscious, but still breathing. Mr. Miller, who had received eight years of medical training while in the U.S. Navy, removed the victim from the car, placed him on the ground, and applied pressure to his wound. He recalled Mr. Malone called 9-1-1, but the operators were asking too many questions, so they put the victim in the backseat, and he drove the victim's car to Ochsner. Upon arrival, he brought the victim into the emergency room and waited for the police to arrive. Mr. Miller testified that he did not see any weapons on the victim or in the car. Mr. Miller testified that he knew of the victim, but did not know him personally.

Detective Harold Wischan, a homicide investigator with the Jefferson Parish Sheriff's Office (JPSO), testified that Detective Anthony Buttone, the lead investigator, requested his assistance at Ochsner on November 22, 2017. When he arrived, the victim's car was near the E.R. with the front driver's side and back passenger doors open. The backseat passenger compartment and the clothing inside the car were stained with blood. He also observed the butt of a revolver beneath the floor mat on the driver's side.

Detective Wischan viewed the victim lying on the hospital bed, intubated and unresponsive, suffering from a gunshot wound to the abdomen. Ultimately,

the victim was transferred to University Hospital in New Orleans where he expired. The hospital retrieved a projectile from the victim's body and gave it to JPSO detectives.

After observing the victim, Detective Wischan was approached by the victim's aunt, Amanda Harris. He asked Ms. Harris if she knew of anyone who would want to harm her nephew. Ms. Harris said she learned from Salvant's aunt that there had been a previous shooting within the 600 block of Bannerwood, during which defendant, Battle, was shot at while seated in his car. According to her, "the word on the street" was that this shooting was in retaliation for the previous shooting.

Amanda Harris testified that she is now Amanda Williams, and the victim was her nephew, her sister's son. She explained that defendant and Salvant are brothers who share the same mother, Bertha Garrison, but have different fathers. Ms. Williams further explained that she is related to Ms. Garrison and they have been neighbors for years. She characterized defendant and Salvant as her cousins, who she had known since they were babies. She testified that Salvant went by the nickname "Man" and that she knew him better than she knew defendant because Salvant was her deceased son's close friend, and he would come by her house. Over the years, she saw defendant every once in a while.

Ms. Williams said she was close to the victim, who went by the nickname "Bang" and sold drugs. She explained that after she heard about the shooting, she and her daughter went to the hospital, where she spoke to the police, providing them with defendant and Salvant's names. She confirmed that she had relayed to the police information that she learned from the neighborhood and families. The police thereafter showed her surveillance videos from Nathan's Discount, and in two of them she identified defendant and Salvant. Although she could not see their faces in the video, she explained that she recognized them because one was taller

than the other, she lived in the same neighborhood as they did, and defendant had a "little funny walk to him" like he was "pigeon-toe[d]."

Erika K. Segura, a deputy with JPSO testified via Zoom. She explained that she was in the United Arab Emirates on deployment with the Navy, while she was still employed full-time with JPSO. On November 14, 2017, eight days before the murder, she responded to a call regarding a shooting that occurred the night before at 672 Bannerwood in Gretna. When she arrived at the scene, she saw that the vehicle, a gray Nissan Maxima, had been struck by five rounds of bullets on the driver's side, and there were shell casings on the ground. Deputy Segura spoke to defendant, who had made the call regarding the shooting early that morning. Defendant told Deputy Segura that he was asleep in his residence at the time the shooting occurred. He stated he did not hear any shots fired, but he came out in the morning and saw the damage to his vehicle. Deputy Segura saw cameras at 689 Bannerwood, which was just across the street from the shooting, and asked the owner for a copy of the camera footage. When the owner was unable to make a copy for her while she was on scene, she used a JPSO camera to record the surveillance video, which rendered the video recording grainy. While watching the video, Deputy Segura observed a vehicle parked in the driveway at 672 Bannerwood. An individual exited the driver's seat, then, a moment later, re-entered the vehicle and closed the door. A second individual approached the vehicle from the driver's side, fired rounds into the vehicle, and then fled. The vehicle backed out of the driveway and also fled the scene. Once she observed this, Deputy Segura realized that the video was not consistent with what defendant had told her. When she spoke to him again, he stated that he was the person in the vehicle at the time the shots were fired. Defendant advised her that he did not know the identity of the shooter. Deputy Segura further explained that JPSO had received a call for service the prior evening on November 13th, regarding shots

fired on Bannerwood, which was consistent with what she saw on the surveillance video. Deputy Segura concluded her investigation by sending the matter to JPSO's homicide division, but there were no suspects.[2]

Detective Buttone, a JPSO homicide detective, testified that he was the lead investigator in this case. His division was notified by the patrol division, and they responded to a strip mall at 403 Lapalco Boulevard and Bannerwood, which is a residential street located next to Nathan's Discount. He explained they collected a fired cartridge casing between the snowball stand and barbershop. No one Detective Buttone spoke to that evening was able to make an identification of anyone that night. He only had a physical description of the perpetrators- two black males, one being a very large, heavy-set individual and the other being a shorter individual, who had a firearm tucked under his arm. Detective Buttone asked assisting officers go to Ochsner while he remained on scene, collected evidence, and obtained surveillance video from multiple cameras at Nathan's Discount. He testified that the video surveillance showed that the victim arrived at the scene approximately half an hour before the shooting. He could then be seen from various cameras walking back and forth to the parking lot multiple times and entering the barbershop. Next, defendant and Salvant can be seen walking toward the barbershop, and the victim is seen leaving the shop whereupon he is confronted by defendant and Salvant.

Detective Buttone was able to slow down and zoom in on some of the Nathan's Discount surveillance video in which defendant and Salvant can be seen confronting the victim and fleeing the scene. On the surveillance video, Detective

---

[2] Sergeant Jason Picou testified that he was formerly employed with JPSO patrol and in the crime scene division. He took photographs of the scene at 672 Bannerwood on November 14, 2017. He also collected casings and a projectile that were found on the grass. He did not speak to any witnesses or review any surveillance in the case.

Buttone added a red rectangle over Salvant's hand, to mark what he believed to be the firearm used in the shooting, which was played for the jury.

Detective Buttone learned from Detective Wischan that a victim's family member provided the names of defendant and Salvant, who lived nearby on Bannerwood, and had also advised Detective Wischan about a recent shooting that occurred on Bannerwood, involving defendant. When Detective Buttone confirmed the shooting on November 13, 2017, he learned that patrol deputy Tinisha Williams, had responded to the report of shots being fired on November 13, 2017, and had reported thereafter nothing was located. Detective Buttone learned that Deputy Williams is related to the victim and to Ms. Williams, who provided information to Detective Wischan at Ochsner.

Detective Buttone confirmed that defendant and Salvant had addresses listed for the residence at 672 Bannerwood. He was able to ascertain the height and weight of defendant and Salvant through a database, and Salvant was listed at 5'5", 165 pounds, and defendant was listed as 6'3", 350 pounds.

He was also able to obtain surveillance video from 689 Bannerwood across the street, but that video's time stamp was incorrect. After calculating the time, Detective Buttone determined the video began at approximately 3:46 p.m., which was less than an hour before the murder. The video depicts a gray Nissan Maxima parked at 672 Bannerwood. Prior to the shooting, two men are seen leaving the residence, one being a large, heavyset male, and the other being a very short male. Both are wearing clothing similar to that worn by the suspects observed on the Nathan's Discount video surveillance, including the undershirts that are exposed from under the hooded sweatshirts. Detective Buttone believed that the shorter man with darker sweatpants was Salvant. While showing the jury a map of the area, he indicated that defendant and Salvant's residence at 672 Bannerwood was a three-minute drive away from Nathan's Discount. Detective Buttone continued

that at about 40 seconds shy of 4:00 p.m., the video depicts the Nissan Maxima arriving at Bannerwood. A person whom he believed to be Salvant, can be seen getting out of the Nissan Maxima. Next, an individual whom Detective Buttone believed to be defendant can be seen walking out of 672 Bannerwood. He based his opinion upon the fact that the individual seen in the Bannerwood video was wearing the same clothing observed on the Nathan's Discount surveillance video, and the individual seen in the Bannerwood video was the same size as defendant.

On the Bannerwood video, the Nissan Maxima is seen departing 672 Bannerwood, heading towards Lapalco at 4:04 p.m. Detective Buttone testified that the victim was shot at approximately 4:40 p.m. He further explained that according to the surveillance video, at approximately 4:56 p.m., the Nissan Maxima can be seen returning to the Bannerwood residence, but parking across the street. After the car is parked, someone can be seen running into 672 Bannerwood, and lights are turned on in the residence. That individual then leaves the residence and enters the car. The car leaves, returning to the residence shortly thereafter, parking in the driveway.

A search warrant for 672 Bannerwood was obtained. During the search, Detective Buttone spoke to defendant and Salvant's mother, Ms. Garrison. Initially, she told detectives that she did not know where her sons were, and she had not seen or spoken to her sons since November 22, 2017. She later changed her statement and said that she had sent Salvant a text but then deleted the messages. Ms. Garrison's cell phone was seized, and the contents were downloaded. A digital forensics analysis produced the contents of Ms. Garrison's phone. A text message dated November 24, 2017 was found on Ms. Garrison's phone that stated, "How's my son?" The message was sent before the search warrant was executed and before Detective Buttone spoke to Ms. Garrison. During the search, defendant and Salvant's identification cards were found in their

respective rooms. A rifle magazine and a cell phone were found in defendant's room. A DVR system for a residential surveillance video and a debit card in his name were located in Salvant's room. Forensic analysis of the DVR system revealed that it had been reformatted, meaning all of the data had been erased, on the day of the homicide. Detective Buttone learned that the DVR system had been placed there by Salvant a week prior to the homicide.

Detective Buttone testified that Donisha Johnson, a relative of the victim, showed up at the detectives' office unannounced. She claimed that her family was accusing her of being involved in the homicide. When she left his office, she said she was available to speak to detectives. Detective Buttone later learned Ms. Johnson knew Salvant. After attempting to contact Ms. Johnson, Detective Buttone ultimately found her at her place of employment, and she agreed to return to Detective Buttone's office. However, when they informed her that her name had come up in their investigation, she became uncooperative. When Ms. Johnson's phone was requested for a search, she began to manipulate her phone and perform a "hard reset" which would erase her data. Detective Buttone seized her phone, and she was arrested for obstruction of justice. A digital analysis of her phone revealed text messages from November 14, 2017, the day after the 672 Bannerwood shooting occurred. The messages were sent to phone number ***-3439,[3] which Detective Buttone believed belonged to Salvant based upon other text messages, and because it was the phone number Salvant had given when he was booked at the jail. The November 14, 2017 text messages between Ms. Johnson and Salvant's phones stated:

Incoming message from Salvant: "Look at the news tonight."

Outgoing message to Salvant: "WTF happened?"

Outgoing message to Salvant: "Is y'all okay? Your momma?"

---

[3] The phone number is redacted to protect the privacy of the party. *See State v. Murray*, 17-534 (La. App. 5 Cir. 3/14/18) 242 So.3d 821, 825 n.3.

Incoming message from Salvant: "Everybody good."

Incoming message from Salvant: "We don't miss."

Outgoing message to Salvant: "Dam, Bro, my nerves bad.  I need a pain pill."

Incoming message from Salvant: "They better get their black clothes ready."

Outgoing message to Salvant: "Yes indeed."

Text messages from November 24, 2017, two days after the murder, between Ms. Johnson and Salvant revealed that Salvant was in Florida.  That day, a text was received from Salvant on Ms. Johnson's phone that directed her to "erase this."  Detective Buttone testified that the text messages were in fact erased.

Arrest warrants were obtained for defendant and Salvant for second degree murder.  In December 2017, defendant was arrested by U.S. Marshals in Florida, and his cell phone was seized.  A photograph of the search warrant that was left at his residence with his mother on November 25th was located on his phone.  Salvant was located by U.S. Marshals in Jefferson Parish, and two cell phones were seized from him.  Detective Buttone testified that there were many unrecoverable deleted items on both defendant and Salvant's phones.  He added that it appeared some phones were used regularly before the homicide, and some were obtained after and were "burner phones."

Dr. Yen Van Vo, who was accepted as an expert in forensic pathology, testified she performed an autopsy on the victim, and she opined that the manner of death was homicide, and the cause of death was the sole gunshot wound to his abdomen.

Linda Tran and Jene Rauch were accepted as experts in the examination of firearms.  They performed ballistic examinations on the casings and projectiles collected from 672 Bannerwood and the murder scenes, and both concluded the

casings and projectiles were not shot from the revolver found in the victim's vehicle.

## LAW AND DISCUSSION

On appeal, defendant assigns five errors, challenging the sufficiency of the evidence presented against him at trial, contending the trial court erred in admitting evidence of the November 13, 2017 shooting at 672 Bannerwood, as well as in ruling upon the state's motion in limine without written reasons, in allowing Erika Segura to testify via Zoom video, and in permitting Amanda Williams (formerly Harris) to identify defendant and Salvant in surveillance footage.

### Sufficiency of the Evidence

On appeal, defendant argues that the evidence is insufficient to convict him of second degree murder. Defendant avers that his entire conviction rests upon a rumor and a grainy surveillance video, which shows neither of the suspects' faces nor any weapon; and the video leaves the timing of the shooting unclear, as it contains no audio, and the victim is visible fleeing while remaining fully upright.

Defendant also argues that the evidence is entirely circumstantial and there was no eyewitness identification of him. He finally argues that the text messages exchanged between Salvant and Donisha Johnson do not implicate him or Salvant, and that even if the evidence is viewed under the *Jackson*[4] standard, it fails to exclude every reasonable hypothesis of innocence.

Secondarily, defendant argues that even if this Court finds sufficient evidence that he was one of the suspects seen in the surveillance footage, the evidence remains insufficient to prove that he participated as a principal to second degree murder. Defendant argues that mere presence at the scene of a crime is insufficient to convict someone as a principal; that in order to prove him guilty as a

---

[4] *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

principal to second degree murder, the State was required to prove he aided or abetted in the killing of a human being when he had specific intent to kill or to inflict great bodily harm, or that he directly or indirectly counseled or procured another to commit the crime. While defendant conceded a person may be convicted as a principal to second degree murder even if he did not personally fire the shot, he argues there is no evidence that he gave any counsel to Salvant in the commission of the crime, and the jury could only speculate that he was guilty as a principal to second degree murder.

In reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189. When circumstantial evidence is relied upon to prove the commission of the offense, La. R.S. 15:438 provides, "[A]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. *Baham*, *supra*.

The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at the trial established guilt beyond a reasonable doubt but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1103.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is the identification, the State is required to negate any reasonable probability of misidentification to carry its burden of proof. *State v. Ray*, 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, *writ denied sub nom. State ex rel. Ray v. State*, 13-1115 (La. 10/25/13), 124 So.3d 1096. Identification by only one witness is sufficient to support a conviction. *State v. Williams*, 08-272 (La. App. 5 Cir. 12/16/08), 3 So.3d 526, 529, *writ denied*, 09-143 (La. 10/16/09), 19 So.3d 470. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297.

Principals are defined under La. R.S. 14:24 as follows, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. *State v. Pierre*, 93-893 (La. 2/3/94), 631 So.2d 427, 428; *State v. King*, 06-554 (La. App. 5 Cir. 1/16/07), 951 So.2d 384, 390, *writ denied*, 07-371 (La. 5/4/07), 956 So.2d 600. In addition, under the law of principals, a person may still be convicted of a crime

even if he has not personally fired the fatal shot. *State v. Massey*, 11-357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 463, *writ denied sub nom. State ex rel. Massey v. State*, 12-991 (La. 9/21/12), 98 So.3d 332.

Mere presence at the scene of a crime does not make one a principal to the crime. However, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." *State v. Page*, 08-531 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied*, 09-2684 (La. 6/4/10), 38 So.3d 299. An individual may only be convicted as a principal for crimes in which he personally has the requisite mental state, and the intent of the accomplice cannot be imputed to the defendant. *State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 822, *writ denied*, 21-316 (La. 5/25/21), 316 So.3d 2 (citing *State v. Chattman*, 01-556 (La. App. 5 Cir. 10/30/01), 800 So.2d 1043, 1048, *writ denied*, 01-3320 (La. 12/19/02), 833 So.2d 332).

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as a fact but may be inferred from the circumstances and actions of the defendant. *State v. Graham*, 420 So.2d 1126, 1127 (La. 1982). Louisiana courts have recognized that a defendant may possess the requisite intent even though he did not inflict the mortal injury. *Chattman,* 800 So.2d at 1049 (citing *State v. Meyers*, 95-750 (La. App. 5 Cir. 11/26/96), 683 So.2d 1378, *writ denied*, 97-234 (La. 6/20/97), 695 So.2d 1350).

Defendant was convicted of second degree murder in violation of La. R.S. 14:30.1, which defines second degree murder as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm.

*State v. Massey* is a case in which the facts are strikingly similar to those in this case. In *Massey*, 91 So.3d at 464, this Court found that evidence was sufficient to support a verdict that the defendant was guilty of second degree murder. An eyewitness testified that she saw the defendant and his brother in a white truck driving slowly through the neighborhood shortly before the shooting. After hearing gunshots, the eyewitness turned around and stated she saw the white truck in the middle of the street with the defendant and his brother standing by the victim. She testified that she only saw the defendant shoot at the victim but could not state who fired the shots before she turned around. She added that she saw the defendant's brother holding a large weapon and the defendant holding a small weapon. The detective in the case testified that both the defendant and his brother were seen leaving his brother's residence on the day of their arrest in the same white truck the eyewitness saw driven by the defendant's brother, with the defendant in the passenger seat on the evening of the murder. The State also presented a theory at trial as to the motive of the murder, when it established that two days prior, a shooting occurred in which the defendant's cousin was shot. Additionally, the defendant's brother had also been shot in the foot prior to the murder. Defendant's brother informed detectives that he believed the victim's cousin or brother had shot him. *Id.* at 464-65. This Court stated that regardless of whether the defendant fired the shot that killed the victim, it found defendant was at least a principal to the second degree murder of the victim. *Id.* at 465.

In *State v. Clarkson*, 11-933 (La. App. 3 Cir. 3/7/12), 86 So.3d 804, *writ denied*, 12-788 (La. 9/28/12), 98 So.3d 826, the defendant did not try to assist the victim, urged others to leave the scene, and left town. The third circuit found the defendant's acts directly or indirectly constituted aiding and abetting the commission of a murder; therefore, defendant's actions satisfied the elements of being a principal to second degree murder. (*See also Page*, *supra*, which held,

under the law of principals, the evidence was sufficient to support a second degree murder conviction when the defendant remained with the shooter on scene, did nothing to prevent the crime, fled the scene rather than going to the victim's aid, did not report the shooting, and had been seen discussing a robbery on the day of the murder).

In the instant matter, we find that the State presented sufficient evidence to convict defendant of second degree murder. The evidence proved that on November 13, 2017, defendant was at his residence, 672 Bannerwood, seated in his gray Nissan Maxima, when an unknown individual fired shots into his vehicle.

Approximately nine days later, Mr. Jaber saw defendant and Salvant, wearing black sweatshirts with the hoods up and tied tightly around their faces, approach and hit the victim right before the victim was shot. Although Mr. Jaber could identify only Salvant in a photographic line-up, his testimony reflected that one of the perpetrators was much taller than the other. He also testified that Salavant, the shorter of the two, had a gun in his hand. Detective Buttone confirmed that Salvant was listed at 5'5", 165 pounds and defendant was listed as 6'3", 350 pounds.

The Nathan's Discount video surveillance corroborated Mr. Jaber's testimony and showed that defendant and Salvant were together when they arrived at the barbershop and approached the victim, both wearing black sweatshirts with the hoods pulled tight around their heads. After the victim was shot, they are seen fleeing on foot together, headed in the direction of Bannerwood, the same street of their residence, which was a three-minute drive from Nathan's Discount.

The 689 Bannerwood video surveillance, showed that on the day of the murder, defendant and Salvant left their residence dressed in the same clothing as seen in the Nathan's Discount video. They drove toward Lapalco in a gray Nissan Maxima, the same car that defendant had been sitting in when he was shot at days

prior.  About 16 minutes after the victim was shot, the video showed defendant and Salvant returning to their residence in the same Nissan Maxima.

Ms. Williams advised Detective Wischan about the November 13, 2017 shooting involving defendant.  She revealed defendant and Salvant are brothers and she has known them since they were babies.  She was shown multiple surveillance videos from Nathan's Discount, and she identified the individuals in hooded sweatshirts as defendant[5] and Salvant.

Text messages between Ms. Johnson and Salvant on November 14, 2017, one day after the first incident, showed that Salvant likely informed Ms. Johnson of the shooting that occurred the prior evening.  Salvant told Ms. Johnson, "[T]hey better get their black clothes ready."  A text message to Ms. Johnson from Salvant on November 24, 2017, following the murder, stated that he was in Florida.  A text message sent from Salvant to Ms. Johnson on November 25, 2017, stated, "erase this."

Through surveillance videos and Ms. Williams' identification of defendant, the jury was presented with evidence that defendant went to the scene of the crime with his brother, Salvant.  Although no one reported seeing defendant with the gun, the jury saw the surveillance footage in which defendant could be seen in a physical altercation with the victim along with Salvant.  After the victim was shot, surveillance showed defendant and Salvant, fleeing the scene, back towards Bannerwood.  Defendant was arrested in Florida, and a photo was found on his phone of the search warrant that was left at his residence.  A defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. *State v. Cazenave*, 00-183 (La. App. 5 Cir. 10/31/00), 772 So.2d 854, 860, *writ denied*, 00-3297 (La. 10/26/01), 799 So.2d 1151.

---

[5] Defendant points out multiple times in his brief that the surveillance video shows he is "clearly not pigeon-toed."  Regardless of how he was described by Ms. Williams, the surveillance video reflects that defendant has a distinct walk.

Given defendant's actions before, during, and after the murder, and considering the State's theory that the instant murder was in retaliation for the shooting the week prior in which defendant was a victim, we find that the instant case provides evidence upon which a rational jury could have inferred that defendant had the requisite intent for second degree murder, even if he did not fire the fatal gunshot.

We further find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support defendant's conviction of second degree murder beyond a reasonable doubt.

Motion In Limine

In defendant's second assignment of error, he argues that the trial court erred when it granted the State's Motion in Limine to Determine Admissibility of Evidence of Prior Shooting, which allowed the admission of evidence in an unrelated shooting in which he was a victim.

In its motion, the State asked the trial court to determine the admissibility of the evidence of the November 13, 2017 shooting into defendant's car while he was sitting in his vehicle parked in his driveway. In support of the motion, the State introduced the November 14, 2017 text messages between Salvant and Ms. Johnson in which Salvant sent a text message to Ms. Johnson advising her to look at the news that night. Ms. Johnson replied, texting, "WTF happened? Is y'all okay? Your momma?" Salvant replied, "We don't miss," and "They better get their black clothes ready." The State also introduced the police reports from both crime scenes, one of which references the DVR that was seized from defendant's home but erased on November 22, 2017, the date of the instant murder. Counsel for defendant filed a written opposition on July 22, 2020.

The motion came on for hearing on October 15, 2020. The State, both defendant and Salvant, and defendant's attorney were all present via Zoom due to

COVID. The State argued that the evidence it sought to introduce did not constitute "prior bad acts" or crimes of defendant or Salvant under La. C.E. art. 404(B). The State reasoned the aforementioned evidence was relevant to the instant murder because it was *res gestae*,[6] providing context and motive for defendant and Salvant, who are brothers living together at 672 Bannerwood.

Defendant avers here that the State moved to introduce the evidence pursuant to La. C.E. art. 404(B), while acknowledging that the prior incident did not constitute a prior bad act as contemplated by the codal article. Defendant argues that the State, while arguing the evidence was necessary to prove both motive, i.e., retribution, and *res gestae*, failed to cite any legal support for the introduction of evidence in the prior shooting. Defendant further argues the prior shooting is irrelevant as there was no established connection between the two incidents, and admission of the prior shooting evidence was extremely prejudicial because the State sought admission to prove a false motive in an otherwise weak case.

The State responds that the prior shooting evidence is not subject to the limitation of La. C.E. art. 404(B) and is admissible because it is relevant to both the "story of the crime" and to motive, i.e., retribution for the prior shooting. The State avers here, as it did before the trial court, that the prior shooting should not be considered a "bad act" or "other crime" of defendant because he was the victim,

---

[6] *Res gestae*, now called integral act evidence, "relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." La. C.E. art. 404 (B)(1)(a). The purpose of integral act evidence is to complete the story of the crime on trial by providing its immediate context of happenings near in time and place. *State v. Davis*, 18-485 (La. App. 5 Cir. 4/10/19), 269 So.3d 1123, 1133, *writ denied*, 19-716 (La. 11/12/19), 282 So.3d 229. Integral act evidence "encompasses 'not only spontaneous utterances and declarations made before and after commission of the crime but also testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances.'" *State v. Colomb,* 98-2813 (La. 10/1/99), 747 So.2d 1074, 1075-1076; *State v. Neveaux*, 23-477 (La. App. 5 Cir. 11/10/23), 377 So.3d 749, 758, *writ denied*, 23-1633 (La. 3/12/24), 381 So.3d 56.

and therefore, La. C.E. art. 404(B) does not apply, and the evidence is relevant and admissible under La. C.E. arts. 401 and 402.

We agree that the disputed evidence is not subject to La. C.E. art. 404(B)(1)(a). This prohibition against other crimes pertains to other crimes by a defendant, not other crimes of a third person. *State v. Hutchinson*, 22-536 (La. App. 5 Cir. 8/18/23), 370 So.3d 769, 784, *writ denied*, 23-1296 (La. 2/27/24), 379 So.3d 662.

In *Hutchinson*, *supra*, the defendant was charged with second degree murder and obstruction of justice. The State sought to introduce evidence regarding a casing found at an unrelated crime scene after the murder at issue. The casing matched bullet casings found at the murder scene and the State sought to introduce the evidence not as evidence of another crime or bad act by defendant (*ie.*, that defendant was involved in the subsequent shooting), but rather as evidence in support of the obstruction of justice charge based on the allegation that defendant removed the gun from the murder scene. Based on these grounds, this Court determined that evidence of the casing found at the subsequent shooting scene was not subject to La. C.E. art. 404(B), but rather was subject only to the relevancy and probative value versus prejudice balancing test required by application of La. C.E. arts. 401, 402, and 403. Specifically, this Court stated, "We agree that the disputed evidence is not subject to La. C.E. art. 404(B). The prohibition against other crimes pertains to other crimes by the defendant, not other crimes of someone else." *Id*. (citing *State v. Trim*, 12-115 (La. App. 5 Cir. 10/16/12), 107 So.3d 656, 665, *writ denied*, 12-2488 (La. 4/19/13), 111 So.3d 1030; *State v. Joseph*, 96-187 (La. App. 5 Cir. 11/14/96), 685 So.2d 237, 242).

La. C.E. art. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence." La. C.E. art. 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation." In deciding the issue of relevancy, the trial court must determine whether the evidence bears a rational connection to the facts at issue in the case. *State v. Breaux*, 22-581 (La. App. 5 Cir. 5/10/23), 366 So.3d 727, 735. Even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403. The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. *State v. Frickey*, 22-261 (La. App. 5 Cir. 3/1/23), 360 So.3d 19, 50, *writ denied*, 23-468 (La. 11/8/23), 373 So.3d 59. A district court's ruling on the admissibility of evidence will not be reversed absent an abuse of discretion. *State v. Ard*, 20-221 (La. App. 5 Cir. 4/28/21), 347 So.3d 1046, 1055.

As discussed in detail above, the evidence the State sought to introduce was that nine days before Mr. Burns was murdered, Deputy Segura responded to a call for service at 672 Bannerwood, where she observed through neighborhood surveillance camera footage, that while defendant was sitting in his parked car at that location, several gunshots were fired into his driver's side door. Bannerwood is located around the corner from the instant murder scene.

We find that defendant's involvement as a victim of a shooting occurring nine days prior to the murder, which the State posited that defendant and Salvant believed involved the victim, was relevant, and more probative than prejudicial. Therefore, we find the trial court did not abuse its discretion in admitting evidence from the shooting on November 13 and 14, 2017.

Incomplete Record

Defendant next asserts that his constitutional right to a full appellate review of all the rulings was violated because there is no written order in the record nor are there any reasons for the ruling in which the trial court granted the State's motion in limine. Defendant further avers that no one received notice of the ruling.

On June 9, 2020, the State filed its six-page motion in limine which included a dissertation of the facts, the law upon which it relied as well as, in the alternative, a discussion of the requirements of La. C.E. Art. 404(B) with five exhibits in support of its motion. Defendant's attorney filed a two-page brief which set forth the legal basis for his opposition. The motion came before the court for a hearing on October 15, 2020, having been delayed by COVID restrictions. Present by Zoom, again due to COVID restrictions, were the State, defendant's attorney, and both defendant and Salvant. At the conclusion of the hearing, the court took the matter under advisement. On the following day, October 16, 2020, the trial court issued its ruling granting the State's motion via minute entry. The parties next appeared before the court for a status conference on January 6, 2021. There is no indication in this record that defendant objected to the out of court nature of the ruling, requested either a ruling on the record, a written judgment granting the State's motion, or written reasons for judgment. The parties' pleadings and hearing transcript are a part of this record on review.

On appeal, this Court granted a Motion to Supplement the Record with any written order or judgment of the court's ruling on the 404(B) motion. In response, a letter from the court reporter of Division "E" of the 24th Judicial District Court stated, "Please be advised that, although the Motion in Limine in the above referenced case was granted on October 16th, 2020, according to the minute entry, the matter was not handled on the record in open court on said date, therefore I cannot produce a transcript."

La. Const. Art. I, § 19 provides that no person shall be subjected to imprisonment without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. La. C.Cr.P. art. 843 requires, in all felony cases, the recording of "all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."

A defendant has a right to a complete transcript of the trial proceedings, particularly where, as in this case, appellate counsel did not represent defendant at trial. *State v. Sly*, 23-60 (La. App. 5 Cir. 11/2/23), 376 So.3d 1047, 1094, *writ denied*, 23-1588 (La. 4/23/24), 383 So.3d 608. Material omissions from trial court proceedings bearing on the merits of an appeal require reversal; however, a slight inaccuracy in a record or an inconsequential omission from it, which is immaterial to a proper determination of the appeal, does not require reversal of a conviction. *Id*. A defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcript. *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749, 773, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); *State v. Clark*, 19-518 (La. App. 5 Cir. 6/24/20), 296 So.3d 1281, 1289, *writ denied*, 21-62 (La. 3/9/21), 312 So.3d 585. "The materiality of a given omission is measured by the prejudicial effect of the omission on the defendant in accessing the full scope of appellate review[.]" *Id*.

This appellate record contains all relevant pleadings, attachments, and minute entries, as well as a complete transcript of the hearing.

Here, where both the State and the defense filed detailed written pleadings setting forth the basis for motion and opposition, the motion was heard in open court, and the pleadings and hearing transcript are a part of the record, the presence of either a written judgment or reasons for judgement would add nothing of

substance to our analysis of this case. "[A] complete appellate review of a conviction and sentence can be accomplished, even when there are missing portions of the trial record." *State v. Mims*, 97-1500 (La. App. 4 Cir. 6/21/00), 769 So.2d 44, 79, *writs denied*, 00-2255 (La. 6/22/01), 794 So.2d 781, and 00-2270 (La. 6/22/01), 794 So.2d 782.

Further, there is neither a provision within the Louisiana Code of Criminal Procedure, nor jurisprudence, which requires a court to provide written reasons for judgment in a criminal case. Even in the civil context, the court need only provide written reasons for judgment upon a timely request by a party. La. C.C.P. art. 1917. There was none in this case. An appeal is from the judgment, not the reasons for judgment. *Allday v. Newpark Square I Off. Condo. Ass'n, Inc.*, 20-358 (La. App. 5 Cir. 8/18/21), 327 So.3d 566, 573.

We find that the defendant has failed to show how he is prejudiced by an absent written ruling with reasons from the trial court. Further, absence of either the transcript of a judgment rendered in open court, a written judgment, or reasons for judgment on the State's Motion in Limine did not violate defendant's constitutional right to a full appellate review, are inconsequential to our review, meet no prejudice upon defendant, and are otherwise unnecessary. Therefore, we find that the record is sufficient for a proper appellate review, and this assignment is without merit.

Confrontation Clause

In this fourth assignment of error, defendant asserts the trial court erred when it allowed Deputy Segura to testify via Zoom video conferencing, because remote testimony via video violated his Sixth Amendment right to confrontation, and the exception in La. R.S. 15:502 does not apply to Deputy Segura. Defendant argues that the State failed to meet its burden of proving that Deputy Segura's video testimony was necessary to further an important public policy. Defendant

contends that because the testimony laid out the purported motive in the case, its admission was not harmless and requires his conviction be vacated and the matter remanded for a new trial.

The State responds that an important public policy was met because Deputy Segura was stationed overseas for military duty and would likely be there another year. It additionally asserts that there is no Louisiana statutory or codal authority that directly addresses this issue, but La. C.Cr.P. art. 17[7] gives the trial court inherit authority to authorize Zoom testimony. The State contends that even if the trial court erred in allowing Deputy Segura to testify via Zoom, any error would be harmless.

The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The Confrontation Clause of the Louisiana Constitution specifically and expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." La. Const. Art. I, § 16; *State v. Robinson*, 01-273 (La. 5/17/02), 817 So.2d 1131, 1135. Confrontation not only means the ability to confront the witnesses physically but also to secure for the opponent the opportunity for cross-examination, which is its main and essential purpose. *Id*. Cross-examination is the principal way to test the believability and truthfulness of the testimony, and it has traditionally been used to impeach or discredit the witness. *Id.*; *State v. Williams*, 04-608 (La. App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, *writ denied*, 05-81 (La. 4/22/05), 899 So.2d 559.

---

[7] La. C.Cr.P. art. 17 states in pertinent part,
> A court possesses inherently all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders, including authority to issue such writs and orders as may be necessary or proper in aid of its jurisdiction. It has the duty to require that criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done.

Specifically, defendant argues that Deputy Segura is not one of the persons authorized to testify under La. R.S. 15:502, but if that statute authorized her testimony, the State did not seek judicial approval by filing a written notice thirty days in advance of trial.

The issue of whether the persons enumerated under La. R.S. 15:502 is illustrative or exhaustive is *res nova*. The disputed issue regarding the persons enumerated under La. R.S. 15:502(A) is one of statutory interpretation, which is subject to *de novo* review. *State v. Maldonado*, 11-1090 (La. App. 5 Cir. 5/22/12), 96 So.3d 1221, 1224. The starting point in the interpretation of any statute is the language of the statute itself. *Id*. La. R.S. 1:3 provides in part, "Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language… The word 'shall' is mandatory and the word 'may' is permissive." Interpretation of the language in a criminal statute is governed by La. R.S. 14:3, which states, in part:

> [I]n order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.

We start our analysis with the words of the statute itself. La. R.S. 15:502, titled "Testimony by simultaneous broadcast" states in part:

> A. The court may authorize the following persons to testify by simultaneous transmission through audiovisual equipment, if such technology is available in the courtroom, during any criminal proceeding; juvenile court proceeding; or any family court proceeding which is of a criminal nature, and any civil forfeiture proceeding arising from alleged criminal activity:
>
> > (1) Employees of criminalistics laboratories.
> > (2) Coroners.
> > (3) Forensic pathologists.
> > (4) Any other person practicing in the field of knowledge and expertise in the gathering, examination, and analysis of evidence by scientific means.
>
> B. The party seeking to offer testimony as provided in Subsection A of this Section shall, in all cases, except those in juvenile court which

are of a noncriminal nature, provide written notice to opposing counsel not less than thirty days prior to the commencement of the proceeding. A party in a case in juvenile court which is of a noncriminal nature seeking to offer testimony as provided in Subsection A of this Section shall provide written notice to opposing counsel not less than three days prior to the commencement of the proceeding.

Therefore, in specified proceedings and after meeting certain requirements, the court may authorize employees of criminalistics laboratories, coroners, forensic pathologists, and any other person practicing in the field of knowledge and expertise in the gathering, examination, and analysis of evidence by scientific means to testify by simultaneous transmission through audiovisual equipment.

Upon review of the context of La. R.S. 15:502, the statute is located in Part XI of the Code of Criminal Procedure titled "Evidence From Criminalistics Laboratories." The legislative history reflects that La. R.S. 15:502 was enacted in 2009, with the advent of advanced remote testimony capabilities. The purpose was to authorize crime lab employees and other forensics personnel to testify through the use of audiovisual equipment in certain proceedings, to provide for written notice to opposing counsel, to provide for limitations, and to provide for related matters. Acts 2009, No. 272, §1; HB No. 119.

The list of the four categories found in La. R.S. 15:502(A) exclusively addresses expert witnesses: criminalists, coroners, forensic pathologists, and other scientists. In Louisiana, with its wide swath of rural parishes and judicial districts, many of which do not have crime labs, local coroners, etc., this statute provides for the rational availability of expert testimony by remote means upon compliance with certain notice requirements. The statute has no exclusionary language and does not purport to address non-expert witnesses. The availability and admissibility of remote simultaneous broadcast testimony preceded the statute, and nothing in the statute seeks to eliminate that opportunity upon compliance with the factors set forth by the United States Supreme Court as well as this and other

Louisiana appellate courts. *See Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *State v. Luckey*, 16-494 (La. App. 5 Cir. 2/8/17), 212 So.3d 1220, 1225, *writs denied*, 17-432 (La. 10/27/17), 228 So. 3d 1225, and 17-617 (La. 10/27/17), 228 So.3d 1234; *State v. Day*, 17-1455 (La. App. 1 Cir. 6/21/18), 253 So.3d 173, 182, *writ denied*, 18-1228 (La. 4/15/19), 267 So.3d 1126; *State v. Collins*, 10-757 (La. App. 4 Cir. 5/11/11), 65 So.3d 271, 282, *writ denied*, 11-1185 (La. 11/23/11), 76 So.3d 1153, and *writ denied*, 11-1719 (La. 1/20/12), 78 So.3d 140.

A plain reading of La. R.S. 15:502, in connection with its placement in the code and its legislative purpose, leads us to conclude that the statute does not apply to Deputy Segura, and it is not an exhaustive list of every person who may testify via simultaneous broadcast. La. R.S. 15:502 does not seek to exclude all other witnesses from testifying by simultaneous broadcast. Rather, it lists four categories of witnesses who may testify, without making the showing otherwise required for a witness to be permitted to testify via simultaneous broadcast, upon compliance with the specific requirements set forth in 15:502. However, other witnesses, if they make the otherwise necessary showing, may, in the discretion of the court, also testify by simultaneous broadcast.

As Deputy Segura is not a witness in one of the categories of witnesses particularized by La. R.S. 15:502, the efficacy of her simultaneously broadcasted testimony must be reviewed instead through the lens of the Sixth Amendment Confrontation Clause.

In *Craig*, *supra*, the United States Supreme Court addressed the issue of whether the Confrontation Clause allowed a child witness in a child abuse case to testify at trial, outside the defendant's physical presence, by one-way closed circuit television. The defendant argued that the Sixth Amendment required face-to-face confrontation and that anything less failed to satisfy the constitutional guarantee.

Although the *Craig* Court acknowledged that the Confrontation Clause guarantees the defendant "a face-to-face meeting with witnesses appearing before the trier of fact," the Court recognized that it has never held that "the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." *Craig*, 497 U.S. at 844, 110 S.Ct. at 3163. (emphasis as found in original). Rather, "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case." *Id.*, 497 U.S. at 849, 110 S.Ct. at 3165. (emphasis as found in original).

The *Craig* Court found that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial: (1) only where denial of such confrontation is necessary to further an important public policy; and (2) only where the reliability of the testimony is otherwise assured. *Id.* The requisite finding of necessity must be a case-specific one. *Craig*, 497 U.S. at 855, 110 S.Ct. at 3169. Under *Craig*, it is the State's burden to make an adequate showing of necessity. *Id.*

This Court in *Luckey*, *supra*, reiterated the Confrontation Clause's preference for face-to-face confrontation at trial, a preference that must occasionally give way to consideration of public policy and the necessities of the case. *Id.* at 1229. However, in any case, the right to face-to-face confrontation may not be dispensed with lightly. In *Luckey*, the State called as a rebuttal witness an individual who was incarcerated at David Wade Correctional Center, to testify via WebEX, a program for transmitting two-way live video. In finding that the trial court erred in failing to require the State to transport the incarcerated witness to court, this Court stated,

> Confrontation not only means the ability to confront the witnesses physically but also to secure for the opponent the opportunity of cross-examination, which is its main and essential purpose. *State v.*

> *Robinson*, 01-273 (La. 5/17/02), 817 So.2d 1131, 1135. Cross-examination is the principal way to test the believability and truthfulness of the testimony, and it has traditionally been used to impeach or discredit the witness. *Id.*; *State v. Williams*, 04-608 (La. App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, *writ denied*, 05-0081 (La. 4/22/05), 899 So.2d 559.

*Id* at 1228. In *Luckey*, this Court found that the State failed to make a showing of necessity, and the record revealed no grounds upon which the district court could have reasonably reached the conclusion that denial of face-to-face confrontation was necessary to further an important public policy. This Court stated that the State's interest in a slightly swifter resolution of the case did not rise to the level of an important public interest that would justify the denial of confrontation.

Nevertheless, in the *Luckey* case, this Court also found that a violation of a defendant's right to confrontation is subject to a harmless error analysis, citing *State v. Placide*, 11-1061 (La. App. 5 Cir. 6/28/12), 109 So.3d 394, 399-400; *State v. Merwin*, 07-807 (La. App. 5 Cir. 4/15/08), 984 So.2d 842, 846. There, this Court found that the violation of the defendant's right to confrontation was harmless as the guilty verdict was surely unattributable to the error.

In *State v. Hoff*, 18-K-693 (La. App. 5 Cir. 2/19/19) (unpublished writ disposition), *writ granted in part*, 19-475 (La. 6/26/19), 275 So.3d 871, this Court found no error in the trial court's judgment granting the State's motion to allow testimony by simultaneous broadcast, finding that the State, at a contradictory hearing, had made the necessary showing of both the presence of an important public interest, as well as proper steps taken to ensure reliable testimony. This Court also found that the trial court had also taken adequate steps to protect both the reliability of the testimony and the opportunity for full cross-examination. The *Hoff* case provides an excellent example of the meticulous steps which should be taken by both the State and the trial court to ensure protection of the defendant's constitutional right to confront the witnesses against him with reliable remote

testimony via two- way communication.  In *Hoff,* during the pre-trial evidentiary hearing, the State made a showing that it sought to perpetuate the testimony of a dying witness because the witness had suffered a severe stroke with debilitating physical injuries and dementia.  The trial court granted the State's motion with thorough reasons, subject to specific conditions delineated in the court's order so as to meet the requirements of *Craig*, *supra*.  The trial judge there found that denying the testimony of the key witness would limit the fact-finding function of the trial.  The Louisiana Supreme Court granted the writ in part, in order to further delineate the trial court's first stated condition that broadcast conditions permit that, "the witness can see *the defendant and* the person who is questioning *the witness* after the person identifies himself, and that *the defendant and* opposing attorney and trier of fact can see the witness and his responses at all times." *Id.* (emphasis as found in original).

On the contrary, in *State v. Hamed*, 21-167 (La. App. 5 Cir. 8/18/21), 326 So.3d 375, 377, this Court vacated the trial court's ruling granting the State's motion to allow a witness to testify remotely and remanded the matter to the district court for a hearing.  In that case, in an earlier hearing before the trial court, no evidence had been adduced in support of the State's motion, the trial court had failed to make the requisite findings and determinations based upon evidence adduced, and failed to impose conditions sufficient to protect the defendant's constitutional right to confrontation.  This Court in *Hamed* stated that although the conditions and procedures ordered by the trial court were appropriate, they were alone insufficient.  This Court found that, as such, there could not have been an affirmative factual finding, based on properly admitted evidence, that the State had met its burden, or that the requirements of *Craig* and other case authorities had been satisfied.  In vacating the trial court's ruling and remanding the matter to the district court for an evidentiary hearing, this Court stated:

> Thus, the trial court must determine at a pre-trial *evidentiary* hearing that: (1) denial of face-to-face confrontation is necessary to further an important public policy, and that the alleged necessity applies specifically in the trial of this case; and (2) the reliability of the video-conferenced testimony can and will be procedurally assured, as in *Hoff*. The burden is upon the State to show an adequate assurance of both of these requirements by a preponderance of evidence, and the trial court must establish conditions which assure an untainted process for examining the remote witness.

*Id.* at 381. (emphasis as found in original).

A review of this case record reveals that the first time the State mentioned that Deputy Segura would testify via Zoom was during its opening arguments. After several of the State's witnesses testified, the State declared, "Judge, the next witness is going to be the Zoom witness." Counsel for defendant objected and a bench conference was held. Defense counsel particularized that he objected to the testimony via Zoom, and Salvant's counsel added that he thought it was a violation of his client's right to confrontation. The court then inquired about Deputy Segura's location, and the State responded that she was testifying via Zoom because she had been on military duty in the United Arab Emirates for approximately two years and would likely be there another year. The trial court overruled defendant's objection and allowed the testimony to proceed via Zoom.

While active military service overseas is an important public policy consideration, here the State merely announced it was going to use Zoom. The trial court failed to conduct an evidentiary hearing and receive evidence to determine that (1) denial of face-to-face confrontation was necessary to further an important public policy, and that the alleged necessity applied specifically in the trial of this case; and (2) the reliability of the video-conferenced testimony could and would be procedurally assured. The State called no witness, and presented no evidence regarding Deputy Segura's military service, and offered no technical evidence which would ensure adequate conditions in order to ensure reliability. The State failed to meet its burden of proof to show an adequate assurance of both

of these requirements by a preponderance of evidence, and the trial court failed to establish conditions such as those laid out by the court in *Hoff*, *supra* to insure the reliability of the video conferenced testimony and the protection of the defendant's right to full cross-examination. We find that the trial court erred in allowing Deputy Segura to testify via Zoom, violating defendant's Sixth amendment Confrontation Clause rights.

Nonetheless, a violation of a defendant's right to confrontation is subject to a harmless error analysis. *Luckey*, *supra*. An error is harmless when the guilty verdict was surely not attributable to the error. Whether an error is harmless in a particular case depends upon many factors, including: (1) the importance of the witness' testimony; (2) whether the testimony was cumulative in nature; (3) whether corroborating or contradictory evidence regarding the major points of the testimony existed; (4) the extent of cross-examination permitted; and (5) the overall strength of the State's case. *Id* at 1230.

In the instant case, through Deputy Segura's testimony, the State was able to present evidence pertaining to its theory of defendant's motive for the murder of the victim and to complete the story of the crime with her testimony regarding the shooting on November 13, 2017 and the circumstances under which defendant reported the shooting the following day. Her testimony was corroborated by the shell casings she located and the surveillance video from 689 Bannerwood, which she recorded. The testimony was not cumulative, as no other witness testified to similar details described by Deputy Segura. Additionally, the record indicates that defense counsel was able to extensively cross-examine her, notwithstanding the fact that she appeared via Zoom. There were no technical issues that limited her testimony, and no issues were raised while she testified. Lastly, aside from Deputy Segura's testimony, the State presented a strong case that included video from Nathan's Discount showing defendant and Salvant hitting the victim before he was

shot. Ms. Williams was able to identify both defendant and Salvant, and Mr. Jaber identified Salvant. November 22, 2017 surveillance video from 689 Bannerwood showed defendant and Salvant leaving their home wearing the same clothing as depicted in the surveillance video from Nathan's Discount, and returning to their home shortly after the murder. The text messages between Salvant and Ms. Johnson revealed Salvant's thinly veiled intent to respond to the shooting of his brother on November 13, 2017. Previously finding the evidence sufficient under the *Jackson* standard and that the State proved the case beyond a reasonable doubt, we also find that any violation of defendant's right to confrontation was harmless error unattributable to the guilty verdict.

Amanda Williams (Harris) Testimony

In his last assignment of error, defendant asserts the trial court erred when it permitted Ms. Williams (Amanda Harris) to give her lay opinion as to an ultimate issue of fact when she identified suspects seen in surveillance footage as defendant and Salvant, and further erred in that Ms. Williams was not a neutral witness. He contends that Louisiana law does not permit opinion testimony tantamount to finding the defendant guilty of the crime charged.[8] Defendant also argues that Ms. Williams failed to meet the requirements of La. C.E. art. 701 as she testified that she could not recall the last time she saw defendant and failed to demonstrate sufficient personal knowledge to justify her identification of him as the suspect. He further argues that her testimony was not helpful in determining the suspect's identity, her identification was extremely prejudicial, and the identification was tantamount to finding him guilty of the crime.

---

[8] Defendant cites to *State v. Wheeler*, 416 So.2d 78 (La. 1982), and *State v. Montana*, 421 So.2d 895 (La. 1982).

The State responds that Ms. Williams' identification of defendant and Salvant was rationally based on her perception, and given her knowledge of the two men, her identification was helpful to the determination of a fact at issue. The State argues that defendant's contentions that Ms. Williams was not actually familiar with defendant or that she was not certain of her identification are a "fair avenue" for cross-examination and go to the weight of her testimony.

Upon the State calling Ms. Williams to testify, defense counsel, at a bench conference, objected to her anticipated testimony wherein she was expected to identify defendants as the two individuals seen in surveillance video, basing its objection upon La. C.E. art. 701. The trial court ruled Ms. Williams' identification of defendants was admissible and the jury could decide the weight they would give her testimony.

The testimony of a lay witness, who is not testifying as an expert, in the form of opinions or inferences, is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La. C.E. art. 701; *State v. Keller*, 09-403 (La. App. 5 Cir. 12/29/09), 30 So.3d 919, 930-31, *writ denied*, 10-267 (La. 9/17/10), 45 So.3d 1041. Generally, a lay witness is permitted to draw reasonable inferences from his or her personal observations. *State v. Casey*, 99-23 (La. 1/26/00), 775 So.2d 1022, 1033, *cert. denied*, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). Further, testimony in the form of an opinion or inference otherwise admissible need not be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. *State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 507, *writ denied*, 15-685 (La. 2/26/16), 187 So.3d 468. (citing La. C.E. art. 704; *State v. Higgins,* 03-1980 (La. 4/1/05), 898 So.2d 1219, 1234, *cert. denied,* 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005)).

In addressing the efficacy of a lay witness's opinion testimony, a reviewing court must ask two questions in order to determine whether the trial court properly allowed the lay opinion testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness' observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. *Nelson*, 169 So.3d at 506-07. The trial court is vested with much discretion in determining which opinion testimony shall be received into evidence as lay or expert testimony. *Id.* at 507 (citing *State v. Friday*, 10-2309 (La. App. 1 Cir. 6/17/11), 73 So.3d 913, 922, *writ denied*, 11-1456 (La. 4/20/12), 85 So.3d 1258).

In *State v. Berniard*, 14-341 (La. App. 4 Cir. 3/4/15), 163 So.3d 71, 89, *writ denied*, 15-678 (La. 2/26/16), 187 So.3d 468, the defendant argued that the trial court erred by admitting irrelevant and prejudicial testimony given by a detective and another witness to offer opinions as to the ultimate issue of fact in the case, the identity of the shooter. *Id.* The defendant in that case, as here, argued that Louisiana law does not permit opinion testimony tantamount to finding the defendant guilty of the crime charged, citing *Wheeler*, *supra* and *Montana*, *supra*.[9] The trial court in *Berniard* emphasized that both the detective and other witnesses testified to being familiar with the defendant, his physical appearance, his mannerisms, and the manner in which he carried himself. The witness testified that she had known the defendant since elementary school, that they grew up in the

---

[9] *Berniard*, *supra*, summarized the cases as follows,

> In *Wheeler*, the Louisiana Supreme Court held that the trial court had erred in permitting a narcotics officer to offer his opinion that the defendant had been involved in the distribution of marijuana, the crime with which he was charged. In *Montana*, the Court again found that the trial court erred in permitting a police officer, testifying as an expert in the field of illicit use and distribution of heroin, to offer his opinion that defendant had constructive possession of the heroin in his pocket with the intent to distribute the heroin. In both cases, the Court found that the officer's testimony expressed an opinion on the ultimate determination of facts at issue- possession and intent- and, in both cases, the Court found the trial court error constituted reversible error.

*Id.*

same neighborhood, and that she had socialized with him throughout the years. The detective testified that he had previously seen several photographs and videos of the defendant and had opportunities to observe him in person. The fourth circuit found that both witnesses' testimony that the defendant was the person seen in the video shooting at the victim's car, was rationally based on their perceptions and familiarity with the defendant. The court stated that their testimony was also helpful to the determination of a fact at issue – whether the defendant was the shooter. *Id.* at 90-91.

In *United States v. Contreras*, 536 F.3d 1167, 1170 (10th Cir. 2008), a case interpreting the Federal Rules of Evidence, upon which La. C.E. art. 701 is based, the court approved the trial court's admission of a probation officer's identification testimony wherein the officer identified defendant as the perpetrator of a bank robbery, as seen in surveillance video. While the defendant there argued that jurors could have reviewed the surveillance footage and determined for themselves whether he was the robber, the reviewing court found that the probation officer's familiarity with the defendant made her identification helpful to the jury as she had a greater appreciation of the defendant's normal appearance. *Id.* at 1171-72.

In the instant matter, Ms. Williams testified that both defendants were her cousins, and she had known both defendants since they were babies because their mother was her neighbor. While she testified that she knew Salvant better than she knew defendant, she was able to identify them both from the surveillance video because of their statures and because defendant walked "pigeon-toed." She was able to identify them both a second time upon viewing a second surveillance video.

We find no error in the trial court's ruling permitting Ms. Williams' lay opinion testimony identifying defendant and Salvant as the suspects seen in surveillance videos, as her testimony was based upon nuances drawn from her observations of and familiarity with defendant and Salvant personally, having lived

in the same neighborhood, and seeing them over the course of many years. Her testimony, therefore, was helpful in the identification of defendant.

**Errors Patent Review**

We have reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). The review reveals no errors patent in this case.

**DECREE**

For the foregoing reasons, we affirm defendant's conviction and sentence for second degree murder in violation of La. R.S. 14:30.1.

**AFFIRMED**

STATE OF LOUISIANA                          NO. 23-KA-272

VERSUS                                       FIFTH CIRCUIT

WILLIE H. BATTLE                             COURT OF APPEAL

                                             STATE OF LOUISIANA

**SCHLEGEL, J., CONCURS WITH REASONS**

While I concur with the majority's decision to confirm defendant's conviction and sentence, I disagree with the majority's finding that the trial court violated defendant's Sixth Amendment Confrontation Clause rights.

Prior to addressing the merits of this issue, I first express my disagreement with the majority's characterization of defendant's argument on appeal regarding La. R.S. 15:502.[1]  The majority opinion states that defendant contends the trial court erred because the video testimony violated his Sixth Amendment right to face-to-face confrontation "and the exception in La. R.S. 15:502 does not apply to Deputy Segura."  But the defendant does not allege that La. R.S. 15:502 served as a basis for the trial court's alleged error in allowing the video conference testimony.  He simply recognizes that La. R.S. 15:502 is one example of several legislative exceptions to the right to face-to-face confrontation, and that it does not apply to a regular law enforcement officer offering factual testimony, such as Deputy Segura in the present matter.  The State does not contest this position on appeal and it did not argue at trial that La. R.S. 15:502 served as grounds to allow Deputy Segura to testify by video conference.

_____

[1] La. R.S. 15:502 is contained in Title 15 Criminal Procedure, Chapter 2  Evidence, in Part XI, entitled, "Evidence From Criminalistics Laboratories."  Section 15:502 allows testimony during any criminal proceeding by means of "simultaneous transmission through audio-visual equipment, if such technology is available in the courtroom," for the following persons: "1) Employees of criminalistics laboratories; 2) Coroners; 3) Forensic pathologists; and 4) Any other person practicing in the field of knowledge and expertise in gathering, examination, and analysis of evidence by scientific means."

23-KA-272                                    1

Accordingly, I do not agree with the majority's decision to engage in an extensive analysis regarding the scope and application of this provision. I also do not agree with the majority that an extensive pre-trial evidentiary hearing was necessary to ensure the protection of the defendant's Sixth Amendment rights prior to allowing the Zoom testimony considering the particular circumstances involved in this matter; 1) an uncontested representation by the State that Deputy Segura had been on military duty for almost two years in the United Arab Emirates ("UAE") and would not return for over another year; and 2) a courtroom containing advanced technology readily capable of meeting Sixth Amendment Confrontation Clause requirements.

Defendant argues on appeal that the State failed to prove that Deputy Segura's video testimony was necessary to further an important public policy. As the majority explains, the seminal case regarding the right to face-to face confrontation is *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). In *Craig,* the United States Supreme Court recognized that while face-to-face confrontation is preferred, the court had never held that "the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face confrontation with witnesses against them at trial." 497 U.S. at 844, 110 S.Ct. at 3163. The *Craig* court further held that remote testimony is permissible if it is 1) necessary to further an important public policy; and 2) the reliability of the testimony is otherwise assured. 497 U.S. at 857, 110 S. Ct. at 3170. The requisite finding of necessity to further an important public policy must be a case-specific one. 497 U.S. at 855, 110 S.Ct. at 3169; *State v. Hamed*, 21-167 (La. App. 5 Cir. 8/18/21), 326 So.3d 375, 379.

Thus, the question before this Court on appeal is whether the State satisfied its burden to demonstrate that the video conference testimony was necessary to accommodate an important public policy. Though I am not aware of a Louisiana

court that has addressed this exact issue regarding deployment, courts in other states have determined that accommodating military service is an important public policy warranting witness testimony by video conference. In *Rivera v. State*, 381 S.W.3d 710 (Tex. App. 2012), a crime scene investigator in a murder trial was on active military duty in Iraq. The Texas appellate court concluded that "under the circumstances, the preference for having witnesses testify in the courtroom must give way to the practical considerations involving Taylor's military obligation that made his physical presence impractical. The procedure the trial court followed, allowing Taylor to participate in the trial by live videoconference while in full view of those participating in the courtroom, did not violate Rivera's rights under the Confrontation Clause of the Sixth Amendment." *Id.* at 713.

More recently in *Bragg v. State*, 2023 WL 2623206 (Ala. Crim. App. 2023), *cert. denied*, 2023 WL 5313960 (Ala. 2023), an Alabama appellate court determined that a defendant's Sixth Amendment Confrontation Clause rights were not violated by allowing two witnesses, who were active-duty fighter pilots in the French navy, to testify via two-way video. The appellate court recognized that the important public policy of accommodating a witness's active-duty military satisfied the requirements established by *Craig*. I agree.

The majority in the present matter does not address this issue, even though it was specifically raised by defendant on appeal – that is whether overseas military duty qualifies as an important public policy. Instead, the majority on its own determined that defendant's Sixth Amendment confrontation rights were violated because the State did not present evidence at a pre-trial evidentiary hearing regarding Deputy Segura's military service and the trial court's ability to ensure reliable video testimony. Defendant did not raise objections as to any of these issues though during the trial and does not now dispute the veracity of the prosecutor's representation regarding Deputy Segura's military service in the

UAE. In fact, Deputy Segura confirmed during her trial testimony that she was on deployment with the Navy and was currently in the UAE in the Dubai area.

In *People v. Giurdanella*, 144 A.D.3d 479, 41 N.Y.S.3d 409 (1st Dept. 2016), the appellate court recognized that the trial court did not err by allowing video conference trial testimony without first holding a pre-trial evidentiary hearing. In that case, the witness was overseas in his native country of Egypt and unable to return to New York to testify at trial because the Egyptian government determined the witness could not leave the country until he completed his required military service. The State proposed and the trial court allowed the defendant to testify by remote video testimony using Skype. On appeal, defendant argued that an evidentiary hearing featuring sworn testimony was an absolute prerequisite to establish that the video testimony was necessary to further an important public policy. The appellate concluded that "[a]t the outset, we reject defendant's argument that a full-blown evidentiary hearing, featuring sworn testimony, is an absolute prerequisite to making the required showing. Here, moreover, the facts as to the complainant's inability to appear were uncontested." *Id*. at 481. The appellate court concluded that the prosecutor's uncontested representations to the court regarding the witness's inability to appear due to his unfulfilled military service commitment was sufficient to demonstrate the video conference testimony was necessary to further the public policy of justly resolving the criminal case. *Id*. at 482.

Just as in *Giurdanella*, defendant did not raise any objections regarding the veracity of the State's representations or the logistics of the video testimony during trial.[2] The transcript does not include any objections with respect to the ability of

_____

[2] In order to preserve the right to seek appellate review of an alleged trial court error, the party claiming the error must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. La. C.Cr.P. art. 841; *State v. Lane*, 20-137 (La. App. 5 Cir. 12/23/20), 309 So.3d 886, 907, *writ denied*, 21-100 (La. 4/27/21), 314 So.3d 836. A defendant is limited on appeal to matters to which an

defendant, defense counsel or the jury to see the witness and observe her demeanor during her direct and cross-examination testimony. In fact, the transcript indicates that Deputy Segura testified under oath and was even able to review a video played in the courtroom while testifying. Additionally, the transcript does not indicate that any lagging or buffering occurred during the video testimony.

I recognize that in *Hamed*, *supra*, this Court suggested that a pre-trial evidentiary hearing is required to satisfy the *Craig* standard. However, in making that determination, the *Hamed* court relied on the *Craig* court's statement that the "***trial court must hear evidence*** and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Id*. at 379. The present matter does not involve the question of whether the welfare of a *particular* child requires protection as in *Craig*.[3] Further, we are not dealing with a "one-way closed circuit television." *Craig* was decided in 1990. It is 2024. And it should be well-settled in this post-COVID age that testimony by means of ZOOM is reliable, especially in the 24th Judicial District Court, which is well equipped with advanced technologies in each of its courtrooms.

In conclusion, the issue before this Court is simply whether Deputy Segura's overseas military duty is an important public policy that necessitates the use of video conference testimony. While I agree that the State should have provided

---

objection was made, but also to the grounds for his objection articulated at trial. *Id*. The requirement of a contemporaneous objection is to put the court on notice of an alleged irregularity so that opposing counsel may respond to the issue, and the trial judge may cure a legitimate problem and prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. *State v. Douglas*, 23-331 (La. App. 5 Cir. 2/28/24), 383 So.3d 266, 277.

[3] I recognize that pursuant to La. R.S. 15:283(A), in order for a child or other protected person to testify outside of the courtroom, the trial court must base its decision on expert testimony establishing that: 1) the protected person would be likely to suffer serious emotional distress if forced to give testimony in open court; and 2) without such simultaneous televised testimony, the protected person cannot reasonably communicate his testimony to the court or jury. I agree that these situations require a pre-trial evidentiary hearing.

defendant notice prior to trial of the need for Deputy Segura by video conference, I

do not agree with the majority's finding that the failure to hold a pre-trial

evidentiary hearing violated defendant's Sixth Amendment Confrontation Clause

rights under the particular circumstances of this matter.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**JUNE 17, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-KA-272

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE FRANK A. BRINDISI (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          JANE C. HOGAN (APPELLANT)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
KRISTEN LANDRIEU (APPELLEE)
SHANNON K. SWAIM (APPELLEE)
TAYLOR SOMERVILLE (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053